United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 26, 2004**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
For the Fifth Circuit**

No. 03-50294

UNITED STATES OF AMERICA

Plaintiff - Appellee

VERSUS

GARY M. BRUGMAN

Defendant - Appellant

Appeal from the United States District Court
For the Western District of Texas, Del Rio

Before REAVLEY, DAVIS and DeMOSS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Border patrol agent Gary M. Brugman challenges his conviction and sentence for a violation of 18 U.S.C. §242 - depriving another of his constitutional rights while acting under color of law. Brugman's primary objection relates to the sufficiency of the government's evidence to establish that he used unreasonable force in effecting an arrest and whether his conduct resulted in constitutional injury to the victim. For reasons outlined below we

find no error and affirm.

I.

Appellant Gary M. Brugman was employed as a United States Border Patrol agent stationed at Eagle Pass, Texas. In the late afternoon or early evening of January 14, 2001, Brugman, while on duty, responded to a sensor alert in the Roseta Farms Pecan Orchard area near the United States-Mexico border. Brugman and his partner drove in the direction of the sensor and observed approximately ten individuals attempting to enter the United States illegally. Brugman exited his vehicle and chased the group on foot, yelling in Spanish for them to stop.

Meanwhile, two other Border Patrol agents, Marcelino Alegria and Remberto Perez, heard radio reports that Brugman was responding to a sensor alert, so they proceeded in their vehicle in the direction of the sensor to provide assistance. The pair eventually located the fleeing individuals but, after encountering an irrigation ditch that blocked their pursuit, the agents were forced to continue their chase on foot. After exiting the vehicle, Alegria quickly caught up with the group and apprehended them. According to Alegria, he instructed the group, which consisted of eight to ten illegal aliens from Mexico, to sit down on the ground on their buttocks. The men obeyed the instructions and sat on the ground in a semi-circle.

Less than a minute later, Brugman, who was still chasing the

2

group, arrived at the scene. Brugman approached the group and began asking them why they were running. Brugman then directed his questions specifically to one man, Miguel Jimenez-Saldana, asking him, "Do you like to run?" or "Do you want to run?" When Jimenez-Saldana did not respond, Brugman kicked him, knocking him to the ground. Despite the fact that Jimenez-Saldana did not fight back, resist, or move, Brugman began to punch Jimenez-Saldana in the ribs with his hands. Brugman then approached a second alien, posed the same questions to him, and kicked him over as well. The second alien also refrained from fighting back, resisting, or moving. Thereafter, Brugman, Alegria, and Perez (who by now had also arrived at the scene), formally arrested the aliens and led them away to a transport vehicle to be processed. When the aliens arrived at the Border Patrol station, Jimenez-Saldana saw a sign encouraging individuals to report abuse by Border Patrol agents. Jimenez-Saldana mentioned the incident to a Border Patrol officer who then filed a formal complaint on Jimenez-Saldana's behalf.

A grand jury indicted Brugman with one count of depriving another of his constitutional rights while acting under the color of law, in violation of 18 U.S.C. § 242.[1] Brugman pled not guilty and was tried before a jury in a four-day trial. The jury found

---

[1] The indictment alleged that Brugman, "while acting under the color of law, did kick and strike Miguel Angel Jimenez-Saldana, resulting in bodily injury," and thereby "did wilfully deprive Miguel Angel Jimenez-Saldana of his rights secured and protected by the Constitution and laws of the United States to be free from the use of unreasonable force by one acting under color of law."

3

Brugman guilty. After denying Brugman's post-trial motions and overruling Brugman's objections to the PSR, the district court sentenced Brugman to 27 months' imprisonment followed by two years of supervised release. This appeal followed.

## II.

We consider first Brugman's challenge to the sufficiency of the evidence. The standard of review for a claim of insufficient evidence is whether "a rational trier of fact could have found that the evidence establishes the essential elements of the offense beyond a reasonable doubt." United States v. Villarreal, 324 F.3d 319, 322 (5th Cir. 2003) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)). The court reviews the evidence in the light most favorable to the government with all reasonable inferences and credibility choices to be made in support of the jury's verdict. United States v. Bass, 310 F.3d 321, 325 (5th Cir. 2002) (citing United States v. Hinojosa, 958 F.2d 624, 628 (5th Cir. 1992)). The evidence need not exclude every reasonable hypothesis of innocence and the jury is free to choose among reasonable interpretations of the evidence. United States v. Perrien, 274 F.3d 936, 939-40 (5th Cir. 2001).

Brugman contends the evidence was insufficient in two respects. First, he maintains the government failed to provide sufficient proof that Brugman acted with the specific intent to deprive Jimenez-Saldana of his constitutional rights. Second,

4

Brugman contends the evidence is insufficient to establish that Jimenez-Saldana suffered constitutional injury.

**A.**

Brugman argues that the government failed to prove that he acted with the specific intent to deprive Jimenez-Saldana of his right to be free from the use of unreasonable force because: 1) the testimony of government witnesses who observed Brugman kick and strike Jimenez-Saldana was so conflicting and inconsistent that it gave more support to a theory of innocence than to a theory of guilt; and 2) Brugman's use of force was reasonable because he believed that Jimenez-Saldana was going to flee or attack Alegria.

A violation of 18 U.S.C. § 242 requires an individual to: 1) willfully; 2) deprive another of a federal constitutional right; 3) under color of law. United States v. Williams, 343 F.3d 423, 431-32 (5th Cir. 2003). The indictment upon which Brugman was ultimately convicted charged him with wilfully and intentionally depriving Jimenez-Saldana of his constitutional rights by subjecting him to the excessive use of force, thereby causing Jimenez-Saldana bodily injury. "Wilfulness," as defined within the context of section 242, requires the jury to find that a defendant acted "in open defiance or in reckless disregard of a constitutional requirement which has been made specific and definite." Screws v. United States, 325 U.S. 91, 105 (1945).

In determining whether there was a "constitutional requirement

5

which has been made specific and definite" that Brugman acted in open defiance of, we focus our analysis on the Fourth Amendment. The Fourth Amendment's protection against unreasonable search and seizures requires that officers refrain from using excessive force, that is, more force than is reasonably necessary, when effectuating an arrest. Graham v. Connor, 490 U.S. 386, 394-95 (1989). "It is clearly established law in this circuit that in order to state a claim for excessive force in violation of the Constitution, a plaintiff must allege (1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable." Bazan v. Hidalgo County, 246 F.3d 481, 487 (5th Cir. 2001) (citation omitted). Whether force is reasonable in an excessive force case is viewed under an objective standard, i.e., "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them," Graham, 490 U.S. at 397, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396.

The jury was entitled to find from the eyewitness testimony that Brugman used excessive force against Jimenez-Saldana. Specifically, Agent Alegria, who was the first Border Patrol agent to catch up with the fleeing group, testified that once he was able

6

to stop the aliens, all of them complied with his order to sit on their buttocks. Alegria further testified the aliens were seated in a circle in a "secure and safe" position and that he was outside of that circle facing them when Brugman approached the group. According to Alegria, it was at this time that Brugman approached Jimenez-Saldana and asked him, "Do you like to run?" When Jimenez-Saldana did not respond, Alegria stated that Brugman pushed Jimenez-Saldana to the ground with his foot and "punched him a couple of times on the rib side" with such force that Alegria could "hear the pounds" on Jimenez-Saldana's ribs. Thereafter, Alegria testified, Brugman approached a second alien, asked the same question he had posed to Jimenez-Saldana about whether he liked to run, and then pushed him down as well, delivering one or two punches to the second alien.

Agent Alegria's testimony was supported by Jimenez-Saldana who testified that he obeyed Alegria's command to sit on his buttocks and at no point thereafter did he or any other alien attempt to stand. Jimenez-Saldana further testified that Brugman approached him, asked him if he wanted to run, kicked him, and then "grabbed from the back of the head and pushed my head into the ground."[2]

Agent Perez, who was providing support in the chase, approached the group on foot and witnessed the alleged incident from 80 to 100 yards away. Perez testified that the aliens

---

[2] Jimenez-Saldana testified in Spanish through a court interpreter.

7

appeared to be stationary although a couple of them looked like they were kneeling.  Perez stated that he then observed Brugman kick one of the aliens and, although he was some distance from the scene, he "heard a thud" from the impact of Brugman's kick.

Brugman maintains that this court must reverse his conviction because of the inconsistent testimony from the Government's three witnesses.  Specifically, Brugman contends Alegria's testimony that Brugman "pushed" Jimenez-Saldana with his foot and then "punched" him with his hands is inconsistent with Jimenez-Saldana's own testimony that Brugman "kicked" and then "pushed" his head to the ground.

Brugman's argument is unpersuasive.  The indictment alleged that Brugman "did kick and strike" Jimenez-Saldana.  Both Alegria and Jimenez-Saldana testified that Brugman, after asking Jimenez-Saldana whether he liked to run, struck him with his foot and caused him to fall to the ground, after which Brugman got down on his knees and used his hands to strike Jimenez-Saldana again, either by "punching" as described by Alegria or by "grabbing" and "pushing" as stated by Jimenez-Saldana.  While Alegria and Jimenez-Saldana may have used different terminology to describe the incident, their version of Brugman's conduct is substantially similar.

Brugman also argues that because Agent Perez only saw Brugman kick, not strike, Jimenez-Saldana his conviction is infirm.  Again, this argument is unpersuasive.  Perez acknowledged that because of

8

his distance from the incident, there were many things he could not see. Perez' testimony is highly probative, however, as to the level of force Brugman used. Perez testified that even from 80 to 100 yards away, he heard a loud thud immediately after seeing Brugman kick Jimenez-Saldana. While Perez's observation that some of the aliens appeared to be kneeling is inconsistent with the testimony elicited from the other government witnesses, this inconsistency does not negate the highly probative value of Agent Alegria's testimony, who was the closest agent to the scene and testified that all aliens complied with his order to sit on their buttocks.

Moreover, there was evidence presented at trial regarding the "Use of Force" Model, which is used to instruct federal law enforcement officers on how to select an appropriate level of force when responding to a suspect's actions. The Model is explicitly based upon the Supreme Court's articulation of the Fourth Amendment's "objective reasonableness" test. See Graham, 490 U.S. at 397. According to the Model, when a suspect is passively resistant, an officer should use "soft empty hand controls" and verbal commands to direct the suspect. Based on eye witness testimony Jimenez-Saldana did not resist arrest, was complying with the agent's orders, and by all accounts (except Brugman's) was at most passively resistant. Therefore, under this model the jury was entitled to find that any physical force Brugman used in excess of soft empty hand controls was objectively unreasonable.

9

Brugman himself testified that he kicked Jimenez-Saldana, using more than a de minimis amount of force. Specifically, Brugman testified that "when I ran up and pushed him with my foot, I pushed him with 100 percent of my force, and I did sit him down quite rough, yes." Brugman further testified that "100 percent" of his force included 195 pounds of body weight plus an additional 25 pounds of gear. Thus, Brugman's own testimony, corroborates the eye witness testimony that Brugman's use of force against Jimenez-Saldana was excessive and objectively unreasonable.

In sum, the record evidence supports the jury's implicit findings that: 1)Brugman acted willfully, i.e., in open defiance of a recognized constitutional requirement when he kicked and then struck Jimenez-Saldana; and 2)that Jimenez-Saldana was deprived of his Fourth Amendment rights as a result of Brugman's use of excessive force, which was objectively unreasonable.

## B.

Brugman also argues that the evidence was insufficient to prove that his conduct resulted in bodily injury to Jimenez-Saldana because unsubstantiated allegations of physical pain which are de minimis, do not result in a constitutional violation. In order to satisfy the injury requirement for purposes of section 242, it is not necessary for the jury to find that the victim suffered "significant injury." United States v. Harris, 293 F.3d 863, 870 (5th Cir. 2002), cert. denied, 537 U.S. 950 (2002) (citing United

10

States v. Sanchez, 74 F.3d 562, 565 (5th Cir. 1996)). The government need only show that the victim suffered "some" injury although this requires proof of more than "de minimis injury". Williams v. Bramer, 180 F.3d 699, 703 (5th Cir. 1999) (citing Ikerd v. Blair, 101 F.3d 430, 434 (5th Cir. 1996)).  In determining whether an injury is more than de minimis this court has explained:

> [W]e look to the context in which that force was deployed. "[T]he amount of injury necessary to satisfy our requirement of 'some injury' and establish a constitutional violation is directly related to the amount of force that is constitutionally permissible under the circumstances."
>
> What constitutes an injury in an excessive force claim is therefore subjective--it is defined entirely by the context in which the injury arises.

Id. at 703-04 (internal citation omitted).

> As we stated in Ikerd:
>
> Similarly, even in the fourth amendment context, a certain amount of force is obviously reasonable when a police officer arrests a dangerous, fleeing suspect. *See Tennessee v. Garner,* 471 U.S. 1, 3, 105 S.Ct. 1694, 1697, 85 L.Ed.2d 1 (1985).  On the other hand, in the context of custodial interrogation, the use of nearly any amount of force may result in a constitutional violation when a suspect "poses no threat to [the officers'] safety or that of others, and [the suspect] does not otherwise initiate action which would indicate to a reasonably prudent police officer that the use of force is justified." *Ware v. Reed,* 709 F.2d 345, 351 (5th Cir. 1983).

Ikerd, 101 F.3d at 434.

The importance of the context in which the injury is sustained is well illustrated in Bramer.  In Bramer, this court was faced with a similar question of determining whether, a victim's alleged

injuries were sufficient to constitute a constitutional violation. 180 F.3d at 704. In that case, the victim alleged that he suffered the same physical injury, loss of breath and momentary dizziness, after two separate encounters in which he was choked by the officer, Bramer. Id. During the first encounter Bramer was conducting a search of the victim's mouth. The second encounter occurred after the victim threatened to report Bramer. The court found that the injuries sustained during the search did not rise to the level of a constitutional violation. However, in the second incident, in choking the victim, the officer acted maliciously, and therefore was "not legitimately exercising force in the performance of his duties as a police officer." Id. The court concluded, "[i]n this context, we hold that, although suffering from dizziness, loss of breath, and coughing are not significant injuries, combined, they qualify as a cognizable injury when the victim is maliciously assaulted by a police officer." Id.

As previously discussed, the evidence established that Brugman willfully kicked and struck Jimenez-Saldana at a time when Jimenez-Saldana was no longer fleeing or actively resisting the Border Patrol officers authority. As such, Brugman was not "legitimately exercising force in the performance of his duties" as a Border Patrol agent. Although no evidence of visible manifestation of injury was produced, Jimenez-Saldana testified that upon being kicked, he felt pain and lost his breath. This testimony is consistent with Agent Alegria's testimony that he heard Jimenez-

12

Saldana emit a "grunting noise" while being kicked and struck. Jimenez-Saldana further testified that he experienced residual pain for approximately three days after the incident.

The court in Bramer did not require manifestation of the alleged injury. Certainly, it would be difficult to document physical signs of dizziness, loss of breath, or coughing. Based on the context within which Brugman exercised force against Jimenez-Saldana and the resulting testimony from Jimenez-Saldana regarding the extent of his physical injuries, we are satisfied that Jimenez-Saldana's injuries exceeded the de minimis threshold. Therefore, viewing the evidence in the light most favorable to the government, there was sufficient evidence to support the jury's finding that Brugman's conduct resulted in "some injury" to Jimenez-Saldana in violation of 18 U.S.C. § 242.

**III.**

Brugman argues next that the district court erred in overruling his objection to "similar act" evidence under F.R.E. 404(b) to establish his intent. The alleged "similar act" occurred approximately six weeks after the instant offense. The government's witness, Rodriguez-Silva, testified that he and a group of friends were attempting to carry approximately 100 kilograms of marijuana into the United States from Mexico. Shortly after crossing the border, the group was detected by Border Patrol agents. Rodriguez-Silva stated that Brugman chased after him, and

13

screamed for him to stop.  Rodriguez-Silva thereafter twisted his ankle and fell, allowing Brugman to easily detain him.  Although he offered no resistance, Rodriguez-Silva testified that Brugman climbed on top of him, put his elbows and knees into Rodriguez-Silva's neck and stomach, and then proceeded to put on a pair of gloves and punch Rodriguez-Silva three times in the nose. Rodriguez-Silva testified that he felt pain as a result of being beaten.  Moreover, the injuries for which Rodriguez-Silva received medical treatment were depicted in a photograph taken immediately after his arrest.  The district court overruled Brugman's objection and admitted the testimony.

We review the district court's admission of extrinsic offense evidence over a Rule 404(b) objection under a "heightened" abuse of discretion standard. United States v. Jackson, 339 F.3d 349, 354 (5th Cir. 2003) (citation omitted).  Evidence admitted in a criminal case must be "strictly relevant to the particular offense charged." Id. (citation omitted).  Whether the district court erred in admitting Rule 404(b) evidence depends on whether its decision satisfies the two-prong Beechum test adopted by this Court for examining the admissibility of extrinsic evidence. Sanders, 343 F.3d 511, 517 (5th Cir. 2003) (citing United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978)).  Under the Beechum analysis, "the court must first determine that the extrinsic evidence is relevant to an issue other than the defendant's character, i.e., motive, opportunity, intent, preparation, plan, knowledge, identity, or

14

absence of mistake or accident." Sanders, 343 F.3d at 518. Second, "the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of Rule 403." Id. (citation omitted).

Under the first prong, "the relevancy of the extrinsic evidence derives from the defendant's indulging himself in the same state of mind in the perpetration of both the extrinsic and charged offenses. The reasoning is that because the defendant had unlawful intent in the extrinsic offense, it is less likely that he had lawful intent in the present offense." Beechum, 582 F.2d at 911. If an extrinsic act requires the same intent as the charged offense and the jury could reasonably find that the defendant committed the extrinsic act, then the extrinsic act is relevant to an issue other than the defendant's character, and the first prong is thus satisfied. Id. at 911-13.

Because the crime for which Brugman was charged has as an element an intent requirement, Brugman's intent was at issue, and the admission of extrinsic evidence could therefore be relevant to prove intent. Also, the government adequately demonstrated that the defendant committed the "other act." Id. at 913. See also Huddleston v. United States, 485 U.S. 681, 685-91 (1988). The judge may only decide this preliminary issue against the government, "where the jury could not reasonably find the preliminary fact to exist." Beechum, 82 F.3d at 913 (internal footnote and citation omitted). The district court was presented

15

with the following evidence regarding the Rodriguez-Silva incident: 1) the direct testimony of Rodriguez-Silva that he did not resist arrest once apprehended; 2) Rodriguez-Silva's testimony that Brugman forcibly pinned him to the ground and punched him in the nose three times; and 3) photographic evidence corroborating Rodriguez-Silva's account of his injury. Based on this evidence, the district court was entitled to find that the jury could reasonably conclude that Brugman intended to use excessive force against Rodriguez-Silva.

In considering <u>Beechum</u>'s second prong, the <u>Beechum</u> court identified three factors a district judge should consider when making a ruling on the probative value versus prejudicial effect issue. These factors include: 1) "the extent to which the defendant's unlawful intent is established by other evidence, stipulation, or inference"; 2) "the overall similarity of the extrinsic and charged offenses"; and 3) "how much time separates the extrinsic and charged offenses." <u>Id.</u> at 914-15.

Applying the facts of the instant case to the framework established in <u>Beechum</u>, the district court did not err in finding that the probative value of the extrinsic evidence outweighs any unfair prejudice to Brugman. First, although the government offered the testimony of three witnesses to prove that Brugman acted with the requisite specific intent to deprive Jimenez-Saldana of his constitutional rights, one of Brugman's central arguments was that his intent was to use reasonable force to

16

subdue Jimenez-Saldana and not to use excessive force. Second, there are striking similarities between the extrinsic and charged offenses, including: 1) both the charged offense and the extrinsic act involved Brugman's intent to deprive another of his constitutional rights by using unreasonable force to effectuate an arrest; 2) both offenses involved an illegal alien who was running away from Brugman after being discovered; and 3) both aliens testified that they had complied with Brugman's orders and were not resisting arrest. Third, the extrinsic act took place less than six weeks after the instant offense, which in this Circuit is temporally sufficient. See, e.g., United States v. Moye, 951 F.2d 59, 60, 62 (5th Cir. 1992) (finding that an earlier offense committed approximately a year and a half later "was not so remote in time to the charged offense to deprecate its probity").

Finally, Brugman argues the district court erred by not sua sponte issuing a limiting instruction at the time the testimony relating to the extrinsic act was offered. However, the district court did issue a limiting instruction in the jury charge that limited the jury's consideration of the extrinsic act to the issue of Brugman's intent.[3] In sum, the district court did not abuse its

_____

[3] The jury charge read as follows:

   25. You have heard evidence that the defendant committed an act which may be similar to the one charged in the indictment, but which was committed on another occasion. You must not consider that evidence in deciding whether the defendant committed the act charged in the indictment. However, you may consider this evidence for other, very limited purposes.

17

discretion in finding that the probative value of the extrinsic evidence was not outweighed by unfair prejudice.  The district court did not err in admitting this evidence.

## IV.

The district court sentenced Brugman to 27 months' imprisonment followed by two years' supervised release.  On appeal, Brugman raises two specific challenges to the district court's calculation of his sentence: 1)the adjustment for a vulnerable victim was improper; and 2) he was entitled to a reduction based on acceptance of responsibility.[4]

## A.

Brugman argues that the district court erred in increasing his offense level by two under United States Sentencing Guideline § 3A1.1(b)(1), which authorizes such an adjustment if the offense

---

26.  If you find beyond a reasonable doubt from the evidence in this case that the defendant did commit the act charged in the indictment, then you may consider evidence of the similar act allegedly committed on another occasion to determine:

Whether the defendant had the state of mind or intent necessary ***[, or]*** the motive or the opportunity to commit the act charged in the indictment; or *** acted according to a plan or in preparation for the commission of a crime; or *** committed the act for which he is on trial by accident or mistake.

27.  These are the limited purposes for which any evidence of a similar act may be considered (1 R. 111-112).

[4]Brugman also makes a general argument that the facts as stated in the PSR are contrary to evidence produced at trial.  Brugman offers no specific arguments in support of these statements or how this alleged misstatement of the facts affected his sentence.

involved a "vulnerable victim."

For the two-level enhancement under § 3A1.1(b)(1) to apply, the victim must be "unusually vulnerable due to age, physical or mental condition, or . . . otherwise particularly susceptible to the criminal conduct." U.S. Sentencing Guidelines Manual § 3A1.1(b) & cmt. n.2. "We review the district court's interpretation of the guidelines de novo; we review a finding of unusual vulnerability for clear error and to determine whether the district court's conclusion was plausible in light of the record as a whole." United States v. Lambright, 320 F.3d 517, 518 (5th Cir. 2003) (per curiam) (citing United States v. Robinson, 119 F.3d 1205, 1218 (5th Cir. 1997)).

Citing our previous holding in United States v. Clayton, 172 F.3d 347, 353 (5th Cir. 1999), the Lambright court observed that the two-level enhancement was appropriate where a former deputy sheriff assaulted a victim who "could not defend herself against an assault, and could not flee from harm" and that "[the defendant] took advantage of this restraint and the particular vulnerability of the victim." Lambright, 320 F.3d at 518. In the instant case, the victim was immobile, sitting on the ground, and under the supervision of another Border Patrol agent. Brugman took advantage of this susceptibility and assaulted the victim while he was in this passive state. Accordingly, the district court's two-level enhancement based on its finding that Jimenez-Saldana was a vulnerable victim is not clearly erroneous.

19

**B.**

Brugman also argues that the district court erred in refusing to decrease his offense level by two points pursuant to § 3E1.1, which permits such a reduction for demonstrating an acceptance of responsibility for one's offense. However, the sentencing guidelines instruct that "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1, cmt. n.2. There is no merit to Brugman's argument that he is entitled to a reduction for acceptance of responsibility.

**V.**

For the reasons stated above, we AFFIRM Brugman's conviction and sentence.

AFFIRMED.

20