# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
November 27, 2012

Lyle W. Cayce
Clerk

No. 11-51020

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

JESUS ENRIQUE DIAZ, JR.

Defendant - Appellant

Appeal from the United States District Court
for the Western District of Texas
USDC No. 2:09-CR-1469-1

Before JOLLY, HIGGINBOTHAM, and DENNIS, Circuit Judges.

PER CURIAM:[*]

This criminal appeal was brought by a Customs and Border Patrol (CBP) agent, Jesus Enrique Diaz, who was convicted after a jury trial of depriving another of his rights under color of law, 18 U.S.C. § 242, and of making false statements about material aspects of the incident that led to his conviction, 18 U.S.C. § 1001. Diaz now challenges his convictions on a number of grounds. Having reviewed Diaz's arguments, we AFFIRM the district court's judgment.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-51020

## BACKGROUND

On the night of October 16, 2008, at least three individuals attempted to illegally enter the United States while transporting drugs in the Rosetta Farms Pecan Orchard, a location near the Rio Grande River well known to CBP officers as a migratory path for illegal aliens and drug smugglers. CBP officers detected the illegal activity and began searching for the individuals. One individual was reportedly spotted from a distance, fled, and escaped back to Mexico. Later, two other individuals were found hiding in the same spot where the first man had initially been spotted.

The first individual, Sanchez, was a young man with gang-style tattoos on his body. He was arrested, placed in a prone position, and remained there without incident. The other individual, M.B.E., was younger, smaller, and had no visible tattoos. He, too, was arrested and placed in a prone position. Testimony at trial stated that both remained still and compliant throughout the duration of their arrest and time in custody. One officer estimated that once the individuals had been secured, approximately 10 to 15 agents were in the area.

Appellant Diaz arrived after the individuals were in custody. According to accounts, he immediately began asking, "Where is the marijuana?" and took custody of the smaller, younger individual, M.B.E. At this time, M.B.E. was laying face-down on the ground with his hands handcuffed behind his back. What happened next is disputed by the parties. At trial, the Government presented the testimony of multiple CBP agents, who testified that Diaz placed his knee on M.B.E.'s back, grabbed the chain of his handcuffs, and pushed M.B.E.'s arms toward his head up to a 90-degree angle, causing M.B.E. to cry out in pain as Diaz asked about the marijuana; Diaz performed this action after asking someone to hold down M.B.E.'s legs; Diaz stood M.B.E. up and then swept his legs out from under him, taking him to the ground; and, some testimony indicated, Diaz kicked M.B.E. The government's witnesses gave varying

2

accounts as to the frequency with which Diaz performed these actions. All officers agreed that, while in Diaz's custody, M.B.E. never made any aggressive gestures or attempted to flee.

After Diaz finished these attempts to extract information from M.B.E., he reportedly told the trainees to "take a walk" and "[g]o look for the [marijuana]." Some testimony suggested that he said this multiple times and later added aloud that "the trainees will turn on you in a heartbeat." Other officers then took custody of M.B.E. and Sanchez and took them to the patrol vehicles. At booking, M.B.E. complained of shoulder pain and grunted when his arm was raised for fingerprinting. His body was inspected for bruising and cuts, but no significant marks were found. Later, he visited a doctor who did not diagnose M.B.E. with any injuries but gave him an ointment to treat his sore shoulder.

The next morning, a number of the officers who had been present the night before reported the incident. Internal Affairs (IA) began an investigation shortly thereafter. In a taped interview and in a written statement, both of which were admitted as evidence at trial, Diaz denied using any more than "minimal force," telling the trainees to "take a walk," requesting that someone hold down M.B.E.'s legs, or questioning M.B.E. about the marijuana. Diaz also told IA investigators that M.B.E. tried to escape and that Diaz took him down. Investigators found these statements inconsistent with the statements of the other CBP officers.

Authorities eventually charged Diaz with five counts of making a false statement under 18 U.S.C. § 1001 and with one count of depriving another person of his rights thereby causing "bodily injury" under 18 U.S.C. § 242. After an initial jury trial that resulted in a mistrial due to juror misconduct, Diaz was re-tried and convicted on all six counts by a unanimous jury.

No. 11-51020

## DISCUSSION

Diaz raises four arguments on appeal. He contends that (1) the court erroneously excluded photos of the victim's accomplice; (2) the jury charge incorrectly stated the law relating to § 242; (3) the evidence was insufficient to support his convictions; and (4) jury misconduct should have led to a mistrial. We disagree.

### A.

Diaz argues that the district court erred in refusing to admit photographs of Sanchez's gang-related tattoos at trial. Evidentiary rulings by the district court are reviewed for abuse of discretion, subject to harmless error review. *United States v. Jackson*, 636 F.3d 687, 692 (5th Cir. 2011). "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Id.* However, a district court's decision to refuse admission of evidence on Rule 403 grounds should be "rarely" disturbed and only when there has been a "clear abuse of discretion." *United States v. Maggitt*, 784 F.2d 590, 597 (5th Cir. 1986).

In making its ruling, the district court found that the potential prejudice of these pictures outweighed any probative value. Diaz argues that the court abused its discretion because the photos were probative on the issue of whether Diaz acted "willfully" as required by § 242. According to Diaz, the photographs would have shown that Diaz was under a heightened state of anxiety and that the potential for danger was great, particularly in light of the unapprehended third coconspirator who was reportedly seen.

Great deference is given to the trial court regarding evidentiary rulings, particularly under Federal Rule of Evidence 403. *See Maggitt*, 784 F.2d at 597. The district court, in making its ruling, noted that Diaz would be permitted to testify about the tattoos in order to establish his state of mind but reasoned that the prejudicial effect on the government's case of admitting the photographs

No. 11-51020

outweighed their probative value.   Moreover, because testimony was offered regarding the tattoos, the photographs were cumulative and only marginally probative.  Accordingly, the district court did not abuse its discretion when it excluded the photographs.

## B.

Diaz argues that the jury charge incorrectly stated the law with respect to 18 U.S.C. § 242.  Specifically, Diaz argues that the jury charge on "bodily injury" was improper because including "physical pain" in the definition meant including injuries that this circuit had held to be *de minimis*.  Because Diaz preserved his challenge as to the jury charge, we review "under an abuse of discretion standard, affording the trial court substantial latitude in describing the law to the jurors." *Jimenez v. Wood Cnty.*, 660 F.3d 841, 845 (5th Cir. 2011).

## 1.

To prove a violation of § 242, the government must establish that the defendant (1) willfully (2) deprived another of a "right[] . . . secured or protected by the Constitution or laws of the United States" (3) under color of law.  18 U.S.C. § 242; *see United States v. Brugman*, 364 F.3d 613, 616 (5th Cir. 2004). The Fourth Amendment's "protection against unreasonable search and seizures requires that officers refrain from using excessive force, that is, more force than is reasonably necessary, when effectuating an arrest." *Id.* (citation omitted). "It is clearly established law in this circuit that in order to state a claim for excessive force in violation of the [Fourth Amendment], a plaintiff must allege (1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable." *Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 487 (5th Cir. 2001).

To satisfy the injury requirement, "it is not necessary for the jury to find that the victim suffered 'significant injury,'" *Brugman*, 364 F.3d at 618 (citation omitted), but the government must show that the victim suffered "some" injury

5

beyond "*de minimis*" injury. *Id.* (citation omitted). To determine whether a Fourth Amendment injury is more than *de minimis*, a court must:

> look to the context in which that force was deployed[] . . . [as] related to the amount of force that is constitutionally permissible under the circumstances. What constitutes an injury in an excessive force claim is therefore subjective—it is defined entirely by the context in which the injury arises.

*Brugman*, 364 F.3d at 618 (internal quotation marks and citation omitted). Determining whether the district court abused its discretion by charging the jury that § 242's bodily injury requirement could be satisfied by a finding of physical pain involves a context-sensitive and fact-specific analysis.

2.

Because determining whether a Fourth Amendment injury is more than *de minimis* depends on the context in which the injury arose, *see id.*, we cannot categorically say that the district court may never charge the jury that "bodily injury" may include "physical pain." Moreover, Diaz's argument that including "physical pain" in the definition of "bodily injury" means including injuries that this circuit has held to be *de minimis* is foreclosed by *Brugman*.

In *Brugman*, the defendant willfully kicked and struck Miguel Jimenez-Saldana, who was in a group of approximately ten individuals caught attempting to enter the United States illegally, even though Jimenez-Saldana was, at the time, no longer fleeing or actively resisting the authority of the CBP officers present. *Id.* at 614, 619. Although there was no visible manifestation of injury, Jimenez-Saldana testified that upon being kicked, he felt pain and lost his breath, and that he felt residual pain for approximately three days following the incident. *Id.* at 619. Additionally, a CPB officer testified that he heard Jimenez-Saldana emit a "grunting noise" while being kicked and struck. *Id.* We reasoned that this was sufficient to clear the *de minimis* threshold *even though* there was no visible manifestation of injury. *Id.*

No. 11-51020

Thus, "physical pain" may, depending on the context in which the injury arose, constitute "bodily injury" sufficient to overcome the *de minimis* threshold. Accordingly, we cannot say that the district court abused its discretion in its charge to the jury.

C.

Diaz challenges as insufficient the evidence in support of his convictions under § 242 and § 1001. Where, as here, the defendant fails to renew his Rule 29 motion for acquittal at the close of his case, review of the decision to deny that motion is for plain error. *E.g.*, *United States v. Delgado*, 672 F.3d 320, 328-30 (5th Cir. 2012). We will reverse a denied sufficiency challenge only when faced with a "manifest miscarriage of justice," which exists only if "the record is devoid of evidence pointing to guilt or if the evidence is so tenuous that a conviction is shocking." *Id.* at 330-31 (internal quotation marks and citation omitted).

1.

Diaz argues that even granting every favorable inference and credibility determination in favor of the prosecution, the evidence is insufficient to support his conviction under § 242. Viewing all of the evidence in the light most favorable to Diaz, M.B.E. suffered the following injuries: while on his stomach with his hands handcuffed behind him, his arms were raised up and were then lowered back down causing him pain; he had a knee placed on his back which caused him pain; he was kicked "soccer style"; and, though there was no bone or ligament damage or bruising, M.B.E.'s shoulder was sore for "one or two days." Under this circuit's precedent, Diaz maintains these injuries do not pass the *de minimis* threshold and, thus, cannot form a conviction under § 242.

As previously discussed, to establish a constitutional violation predicated on an excessive use of force, the victim must have suffered "some injury" which is more than *de minimis*. *Brugman*, 364 F.3d at 618. Determining what constitutes "some injury" is highly fact-specific and dependant on the

7

No. 11-51020

circumstances of the individual case. *See id.*; *see also United States v. Harris*, 293 F.3d 863, 871 (5th Cir. 2002) (suggesting that "bodily injury would include a cut or bruise or physical pain"). Here, the record is not devoid of evidence in support of the jury's finding that Diaz's conduct resulted in "bodily injury," which, under the circumstances here, is satisfied by a mere showing of physical pain. There was no plain error.

Diaz also challenges the sufficiency of the evidence regarding the intent element of willfulness. However, the only complaints Diaz offers regarding the evidence turn on credibility determinations made by the jury, which are beyond attack in plain-error review of a denied sufficiency challenge.

Diaz contends that because of the gang-related tattoos, the at-large coconspirator, and the risks associated with CBP actions against drug smugglers, among other things, the evidence was insufficient to establish that Diaz acted willfully and not in aid of some legitimate police objective. However, the Government presented evidence that the at-large coconspirator had already returned to Mexico, numerous CPB agents were present, the scene was secure, and M.B.E. and Sanchez remained still and compliant throughout the incident. Moreover, Diaz was described as "mad," "angry," and "yelling" during the incident. Accordingly, the record is not devoid of evidence supporting the jury's finding of willfulness in support of § 242's requirements.

2.

Diaz also challenges the sufficiency of the evidence to support his convictions under the four counts of making false statements. To establish a violation of 18 U.S.C. § 1001, the Government must establish: "(1) a statement, that is (2) false (3) and material, (4) made with the requisite specific intent, [and] (5) within the purview of government agency jurisdiction." *United States v. Jimenez*, 593 F.3d 391, 399 (5th Cir. 2010) (internal quotation marks and citation omitted). Here, Diaz challenges the falsity element for Count Two

8

No. 11-51020

(minimal force), Count Three (attempt to flee), Count Four (did not question M.B.E.), and Count Five (asked someone to hold down M.B.E.'s legs). Diaz challenges both the falsity and materiality elements for Count Six ("take a walk").

Diaz's falsity challenges focus on inconsistencies and other imperfections in the testimony offered by the Government's witnesses. With regard to Count Three, Diaz attacks the testimony of other the CBP officers because they were not in physical contact with M.B.E. and, as such, would not have been able to gauge whether he was struggling or attempting to flee. Diaz also argues that inconsistencies between M.B.E.'s testimony and that of the CBP agents undermine the proof of falsity for Counts Four and Five. For Count Four, M.B.E. testified that only one agent asked him about the marijuana whereas several CPB officers testified that they asked and that they heard Diaz ask. For Count Five, M.B.E. testified that no one grabbed his legs whereas two CPB agents said they heard Diaz ask someone to hold down M.B.E.'s legs and one officer testified that he held M.B.E.'s legs down for a brief moment. In making his falsity challenges, Diaz simply disagrees with the credibility determinations made by the jury. Under our deferential standard of review, we cannot say the record is devoid of any evidence in support of Diaz's convictions. On each count, there was at least some evidence to enable the jury to find Diaz guilty under § 1001.

With respect to Count Six, Diaz not only challenges the falsity of his statement but also contends that even if he had lied about saying "take a walk," the evidence was insufficient to establish that this statement was material, which we have defined as evidence having "a natural tendency to influence, or . . . capable of influencing, the decision of the [agency]." *United States v. Brown*, 303 F.3d 582, 601 (5th Cir. 2002). Diaz argues that it is unclear how his statement could have influenced the investigation.

9

No. 11-51020

There was sufficient evidence for a reasonable jury to conclude that Diaz's denial that he said "take a walk" was material. A reasonable jury could have concluded that, by denying that he made the statement, Diaz was attacking the credibility of the other CBP officers who spoke to investigators. Because a reasonable jury could believe that such conduct has "a natural tendency to influence" the investigation, *see Brown*, 303 F.3d at 601, the record is not devoid of evidence supporting the jury's finding that statement Diaz made relating to Count Six was material.

### D.

Diaz argues that jury misconduct during his second trial should have resulted in a mistrial. A district court's refusal to grant a mistrial based on the introduction of extrinsic material to the jury is generally reviewed for abuse of discretion. *United States v. Ruggiero*, 56 F.3d 647, 653 (5th Cir. 1995). We thus "accord great weight to the trial court's finding that the [extrinsic material] in no way interfered with any juror's decision." *Id*.

During jury deliberations, a juror conducted independent legal research on her phone by looking up the legal definition of "assault." The jury foreman alerted the judge, who in turn informed the parties. Consequently, Diaz requested that the juror be identified and replaced with an alternate and for the judge to determine whether the research was discussed and to what extent those discussion tainted the other jurors. The judge then conducted an *ex parte* voir dire of the jury, as a group, to determine the nature of these events and report back to the parties.

The jurors explained that Juror #11 had conducted the outside research and had, in the light of that research, become convinced that medical testimony was necessary to establish "bodily injury" under the charge. The rest of the jury, however, maintained that it was required to confine its deliberations to the jury instructions. The judge shared these findings with the parties, explaining that

No. 11-51020

the rest of the jury was unaffected by the outside research and that Juror #11 had insisted on holding the prosecution to a heightened standard.  On Diaz's request, the judge dismissed Juror #11 and replaced her with an alternate juror.  The deliberations then proceeded and Diaz was convicted on all counts.

On a colorable showing that extrinsic evidence has been introduced into the jury room, the district court must investigate whether there has been any impropriety.  *Ruggiero*, 56 F.3d at 652.  Once such a showing has been made, there is a rebuttable presumption of prejudice against the defendant, and the government bears the burden of demonstrating the harmlessness of the breach.  *Id.*  In determining whether "the government has successfully rebutted the presumption of prejudice and shown that there is no reasonable possibility that the jury was improperly influenced," the district court must examine "the content of the extrinsic material, the manner in which it came to the jury's attention, and the weight of the evidence against the defendant." *Id.* at 652-53 (internal quotation marks and citations omitted).

Here, the district court followed the appropriate protocol when the extrinsic evidence was brought to its attention.  Specifically, the court examined "the content of the extrinsic material, the manner in which it came to the jury's attention, and the weight of the evidence against the defendant." *Id.* at 653.[1] Ultimately, the court concluded that "there was no reasonable possibility that the jury's verdict was influenced" by Juror #11's outside research. *See United States v. Davis*, 393 F.3d 540, 549 (5th Cir. 2004).  This is particularly true in light of the judge's finding that the rest of the jury insisted on following on the instructions it had been given.  Accordingly, the district court did not abuse its discretion in its investigation and decisions regarding jury misconduct.

---

[1] Moreover, the district court's decision to question the jury collectively, rather than individually, was fully within its discretion in overseeing the jury.  The district court is not required to question each juror individually in carrying out its required examination.

11

No. 11-51020

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment.