**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**January 17, 2006**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 04-20131

---

UNITED STATES OF AMERICA,

                                      Plaintiff-Appellee,

        versus

Richard Gonzales,
Louis Gomez,
Carlos Reyna,

                                      Defendants-Appellants.

---

Appeals from the United States District Court
for the Southern District of Texas

---

Before GARWOOD, SMITH, and DeMOSS, Circuit Judges.

GARWOOD, Circuit Judge:

Richard Gonzales, Louis Gomez and Carlos Reyna appeal their convictions and sentences for deprivation of civil rights in violation of 18 U.S.C. § 242.  We affirm.

## FACTS AND PROCEEDINGS BELOW

Defendants-appellants were charged in a five count indictment with the willful deprivation, on or about March 25, 2001, of the civil rights of Serafin Carrera while in their

custody, resulting in bodily injury to him, contrary to 18 U.S.C. § 242.  The indictment alleged that each defendant was a Deportation officer with the Immigration and Naturalization Service (INS) and was acting under color of law.  Carlos Reyna was charged in count one with striking and using unreasonable force against Carrera and in count four with deliberate indifference to his serious medical needs.  Richard Gonzales was charged in count two with use of unreasonable force against Carrera by pepper spraying him and in count three with deliberate indifference to his serious medical needs.  Louis Gomez was charged in count five with deliberate indifference to Carrera's serious medical needs.  Each defendant pled not guilty.  Jury trial commenced May 12, 2003 and the jury returned its verdict June 9, 2003, finding Reyna not guilty on count one and guilty on count four, Gonzales guilty on counts two and three and Gomez guilty on count five.  The district court sentenced Gonzales to concurrent terms of 78 months' imprisonment and three years' supervised release on each of counts two and three; Gomez was sentenced to 41 months imprisonment and three years' supervised release; and, Reyna was sentenced to 33 months' imprisonment and three years' supervised release.  On appeal defendants assert divers challenges to their convictions and sentences.

Viewing the evidence in the light most reasonably favorable

to the government, the following factual context is reflected.[1]

The defendants, Gonzales, Gomez, and Reyna worked as deportation officers for the San Antonio division of the INS. They were members of the elite San Antonio Fugitive Unit, a group that specialized in tracking down and deporting illegal aliens with criminal records. Early in the morning of March 25, 2001, their unit, together with INS agents from Houston, prepared to raid a house in Bryan, Texas.  They were advised to be alert. The night before, agents had encountered an armed 15-year old near the house.

At 8:00 AM, the raid began. The San Antonio unit rushed in the front door while the Houston officers maintained a perimeter around the house.  Minutes later, one of the house's occupants, Serafin Carrera, lay paralyzed on the kitchen floor.

The testimony is unclear about which officers took down Carrera, though Gonzales, Gomez, and Reyna were all involved. The prosecution did not charge the defendants with excessive force in taking Carrera down or with causing the broken neck which he suffered in that process.  Instead, the defendants were convicted for their behavior thereafter.[2]

---

[1] None of the defendants testified before the jury.

[2] At the beginning of trial, immediately prior to opening statements by counsel, the court instructed the jury in part as follows:

"The United States' position in this case is that

All three defendants had close contact with Carrera while he lay handcuffed on the floor. Carrera begged for help, screaming "they broke me . . . Tell them to kill me . . . Tell them to take me to a hospital." In response, Gomez taunted, "From here you're going to go to jail and you're never going to get out, you son of

when the defendants encountered Searfin Carrera they used a certain amount of force resulting in an injury to Mr. Carrera's neck. The United States does not allege in the indictment that the amount of force used in the initial encounter with Mr. Carrera in which he was taken down to the floor was criminally excessive. The United States alleges in Count 1 of the indictment that after that initial encounter, defendant Carols Reyna willfully used excessive force against Searfin Carrera by striking him about the body causing bodily injury."

. . .

"I told you that the government does not allege in the indictment that the amount of force used in the initial encounter with Mr. Carrera, in which he was taken down to the floor, was criminally excessive. The indictment does not allege that the injury to Mr. Carrera's neck was the result of a criminal act by the defendants.

You will hear evidence that as a result of this . . . injury, Mr. Carrera was paralyzed. He died 11 months later. The indictment does not allege that the defendants' actions caused Mr. Carrera's death. The government does not seek to hold any of the defendants criminally responsible for the death. You are not to consider the fact that Mr. Carrera died months after the incident as evidence of guilt. It must not enter into your discussions or deliberations when they occur."

Similar instructions were included in the final jury charge.

4

a fucking mother." Officer Gonzales called him "cabron"[3] and invited his fellow officers to wipe their feet on him. The three defendants stood in the kitchen, with Carrera on the floor crying for help, trying to figure out how to get their paralyzed detainee into an INS van. Officer Gonzales, the San Antonio team leader, ordered a detention officer to pull the van closer to the house, saying "I don't want anybody to see what's going on." Next, Gonzales, Gomez, and two other officers dragged Carrera from the house, across the backyard, and into the van. Carrera complained of pain, asking to be shot and put out of his misery, while Officer Gomez pulled him through the van door and onto the front seat. Gomez struggled to position Carrera's limp body on the seat, finally leaving him slumped on his side and handcuffed. As the van departed for the Brazos County Jail, Officer Reyna asked the driver to give Carrera a screen test—an unofficial maneuver in which the driver slams on the brake causing a handcuffed passenger to lurch forward and hit his face against the screen.

The nearby Brazos County Jail was not the final destination for Carrera or any of the other detainees. The INS Officers merely used its parking lot as a makeshift processing area for the illegal aliens. After processing, the aliens were to be sent

---

[3]Not unlike some English expletives, "Cabron" is amenable to use as a term of endearment between friends. However, in this context, it was certainly reasonably inferrable that it was intended and understood as a serious insult.

5

by bus to New Braunfels, and then removed to Mexico.

After all the aliens were loaded into two vans, the officers returned to their cars and followed the vans to the Brazos County Jail for processing. At the jail, all three defendants dragged Carrera off the van, hitting his head against the door on the way out. They dragged him across the parking lot while taunting him and playing with his limp body. Gonzales ordered the bus driver to open the luggage compartment, and threatened, jokingly, to make Carrera ride below. INS officers testified that Gonzales said, "Let's Mace the fucker, see if he budges."

The three defendants dragged Carrera onto the bus. Because the bus had tinted windows, no one outside of it saw what happened next, but after a few minutes all three defendants ran off the bus choking and laughing. With a smirk, Gonzales claimed that he had an "accidental discharge" of pepper spray. A nurse was on duty at the Brazos County Jail, and a hospital just four miles away, but the defendants left Carrera by himself on the floor of the bus, handcuffed, eyes swollen shut, and foaming at the mouth. At around 11:30 AM, three hours after Carrera's neck was broken, the bus left for New Braunfels. Carrera rode on the floor of the bus for three more hours until he reached the Comal County Jail. Upon his arrival, the intake nurse refused to take custody of Carrera without a medical evaluation. He was taken by ambulance to a nearby hospital and then airlifted to a trauma

center in San Antonio.  Eleven months later, Carrera died.

The next day, the cover-up began.  Gonzales called everyone into his office and assured them, "we're going to get through this."  When Gonzales found out that a bus driver had already written a memo about the incident, he called the bus driver into his office and said, "who the fuck told [you] to write a memo . . . nobody told you to write any memos . . . I'm the one that's going to take care of the memos."  Gonzales demanded that the bus driver change his account to say that Carrera had assaulted them. The driver refused.

## DISCUSSION

I.  Sufficiency of Counts Three and Four of the Indictment

Gonzales contends that the district court erred in overruling his motion to dismiss count three of the indictment, concerning his deliberate indifference to Carrera's serious medical needs, for failure to state an offense.  Reyna makes the same contention respecting count four, the comparable count naming him.

We review the sufficiency of an indictment *de novo*.  *United States v. Fitzgerald*, 89 F.3d 218, 221 (5th Cir. 1996).

Rule 7(c) provides that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ." Fed. R. Crim. P 7(c). An indictment's sufficiency is determined by an examination of

7

its specific language, taking account of the indictment as a whole in the context of its statutory background. *United States v. Haas,* 583 F.2d 216 (5th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1788, 60 L.Ed.2d 240 (1979).  The test for sufficiency is not whether the indictment could have been better drafted, but whether it conforms to minimal constitutional standards.  *Haas,* 583 F.2d at 219.  These minimum constitutional standards are met where the indictment alleges "every element of the crime charged and in such a way 'as to enable the accused to prepare his defense and to allow the accused to invoke the double jeopardy clause in any subsequent proceeding.'" *United States  v. Bieganowski*, 313 F.3d 264, 285 (5th Cir. 2002)(quoting *United States v. Webb,* 747 F.2d 278, 284 (5th Cir.1984)).

The indictment alleges that defendants were at all relevant times INS officers and the challenged counts (counts three and four) charge that the particular defendant:

> "while acting under color of law, did act with deliberate indifference to the serious medical needs of Serafin Carrera by denying him medical care and treatment, resulting in bodily injury to Serafin Carrera, and did thereby willfully deprive Serafin Carrera of the right secured and protected by the Constitution and laws of the United States not to be deprived of liberty without due process of law, which includes the right to be free from harm while in official custody.  In violation of Title 18, United States Code, Section 242."

The defendants argue that the statutory element "willfully",

the mental state expressly required by section 242,[4] was not properly charged in the indictment because it was confusingly equated with "deliberate indifference", the mental state associated with the underlying due-process deprivation.[5]

The indictment, in detailing the statutory elements of the crime charged, alleged two potentially different mental states: "willfully" and "deliberate indifference." Further, the "thereby" language in the indictment can arguably be read as wrongfully equating these two mental states. However, deliberate indifference and willfulness are not necessarily inconsistent with each other. And, the validity of an indictment is

---

[4] Section 242 denounces:

"[w]hoever, under color of any law . . . willfully subjects any person in any State . . . to the deprivation of any rights . . . protected by the Constitution. . ."

[5]The defendant Reyna, as an initial matter, also argues that deliberate indifference is a civil standard from section 1983 cases, and that a criminal prosecution under § 242 should require nothing less than willfulness. This argument confuses two separate and independent culpability standards. The willfulness culpability standard that the prosecution must prove to support a § 242 conviction is independent of the "deliberate indifference" standard that the Court requires for a violation of the due process right to medical care while in custody. For example, the Supreme Court has held that "section 1983, unlike its criminal counterpart, 18 U.S.C. § 242, contains no state-of-mind requirement independent of that necessary to state a violation of the underlying constitutional right." *Daniels v. Williams*, 106 S.Ct. 662, 664 (1986). For a § 1983 claim the plaintiff need prove deliberate indifference, because that much is required to prove a violation of the due process right. However, for a § 242 claim, the prosecution must also prove that the defendant acted willfully.

9

determined by reading it as a whole and "by practical, not technical considerations." *United States v. Markham*, 537 F.2d 187, 192 (5th Cir. 1976), cert. denied, 97 S.Ct. 739 (1977). This indictment, as a whole, meets the minimum constitutional standards set out above. It includes every statutory element of a section 242 violation; it provides enough factual detail to enable the accused to prepare his defense; and it is specific enough to allow the accused to invoke double jeopardy in any subsequent proceedings. Accordingly, we reject these challenges to the indictment.

II. Jury Charge

Gonzales raises two objections to the jury charge. He contends, first, that the charge improperly equates willfulness with mere knowledge, and, second, that because the charge does not include a "good faith" instruction requested by Gonzales, it omits an essential element of the offense. We reject these contentions.

Although Gonzales did object to "the entire proposed instruction," he made no intelligible objection to any particular language as equating willfulness with knowledge or as allowing conviction on nothing more than deliberate indifference. Consequently, those complaints are reviewed for plain error only. *United States v. Daniels*, 281 F.3d 168, 183-84 (5th Cir. 2002).

The district court's instruction on willfulness is accurate.

10

Throughout the jury charge, the court explains the concept of willfulness using language borrowed directly from the Fifth Circuit pattern jury instructions and from prior section 242 cases. FIFTH CIRCUIT CRIMINAL JURY INSTRUCTIONS § 1.38 (2001); *United States v. Sipe*, 388 F.3d 471, 479–80 n.21 (5th Cir. 2004); *United States v. Garza*, 754 F.2d 1202, 1210 (5th Cir. 1985).[6]

---

[6] The charge instructed the jury, among other things, that in order to convict the jury must find

> "that the defendant acted willfully, that is, that the defendant committed such act or acts with a bad purpose or evil motive intending to deprive Serafim Carrera of that right"

and that

> "[t]he third element which the government must prove beyond a reasonable doubt is that the defendant acted willfully. Willfully means that the defendant acted voluntarily and intentionally with the intent not only to act with a bad or evil purpose, but specifically to act with the intent to deprive a person of a federal right made definite by decisions or other rule of law . . . .
>
> To find that a defendant acted willfully, you must find that the defendant had the specific intent to deprive another of the federally protected rights, in Counts 1 and 2, to be free from the use of excessive force, and in Counts 3, 4 and 5, to receive necessary medical care while in the custody of government officers when those officers know of the presence of a serious medical need."

With respect to each of the deliberate indifference counts (Counts three, four and five) the court also instructed "the government must prove beyond a reasonable doubt that the defendant knew that Serafin Carrera had a serious medical need and willfully denied or delayed providing necessary medical care either through an act or an omission, disregarding an excessive risk to Mr. Carrera's health" and that this knowledge "cannot be established merely by demonstrating that the defendant was

11

Furthermore, this court has already rejected the argument that an otherwise adequate willfulness instruction is fatally incomplete without further, affirmative instruction on good faith. *See United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998).

III. Sufficiency of the Evidence

A. *Standard of Review*

Each of the defendants challenges the sufficiency of the evidence to support his conviction. Each made an appropriate motion for judgment of acquittal. Accordingly, we will hold the evidence sufficient if, but only if, "a rational trier of fact could have found that the evidence establishes the essential elements of the offense beyond a reasonable doubt." *United States v. Brugman*, 364 F.3d 613, 615 (5th Cir. 2004). We review the evidence in the light most favorable to the government with all reasonable inferences and credibility choices made in support of the jury verdict. *Id.* If the evidence tends to give nearly equal circumstantial support to either guilt or innocence then reversal is required. *United States v. Moreno*, 185 F.3d 465, 471 (5th Cir. 1999).

---

negligent" or "that a reasonable person would have known or that the defendant should have know."

As to the excessive force counts (counts one and two) the jury was also instructed that in order to convict it had to find that the charged defendant "intentionally used force against Serafin Carrera, knowing it to be excessive."

12

B.    *Count Two, Excessive Force*

Gonzales was convicted on count two of the indictment, which charged that he:

> "while acting under the color of law, did assault
> Serafin Carrera by spraying him with Oleoresin Capsicum
> pepper spray, resulting in bodily injury to Serafin
> Carrera and did thereby willfully deprive him of the
> rights . . . protected by the Constitution . . . to be
> secure in his person and to be free from the use of
> unreasonable force by one acting under color of law."

Contrary to Gonzales's contention, we hold that there is sufficient evidence for a rational trier of fact to find, beyond a reasonable doubt, that Gonzales willfully sprayed Carrera. Gonzales's theory at trial was that the pepper spray accidentally discharged in Carrera's face while Gonzales was carrying him onto the bus through a narrow "safety cage" doorway.

Because the bus had tinted windows, no one outside of it witnessed the discharge. However, Frank Gonzalez, an INS detention officer from the San Antonio office, testified that while Gonzales was carrying Carrera to the bus, he said "Let's Mace the fucker and see if he budges." Two other San Antonio detention officers, Gilbert Rodriguez and Rene Cruz, remembered a similar statement. Rene Cruz testified that when Gonzalez, Reyna, and Gomez exited the bus, Gonzales was coughing, smirking sarcastically, and claiming that there had been an "accidental discharge." At the time, neither Gilbert Rodriguez nor Rene Cruz believed him. They both suspected that the accidental-discharge story was a cover-up.

13

Gonzales presented evidence that these testifying officers had given inconsistent accounts of the Carrera incident. From initial statements given to agency investigators to later testimony before the grand jury, their stories had evolved. The testifying officers admitted that they had lied to investigators. They explained that they had stonewalled investigators, motivated by fear of reprisal and a misplaced sense of honor, in order to protect their colleagues. At trial, the officers insisted, they were telling the truth. We do not second guess the jury's credibility determination here.

The only substantive countervailing evidence presented by Gonzales was that accidental discharges had previously occurred with some pepper spray holders and that, on the day of the Carrera incident, Gonzales had pepper spray on his shirt. There was no testimony that the discharge was accidental.

We conclude that a rational jury could find beyond a reasonable doubt that the discharge was intentional.

Gonzales also asserts that the government failed to prove, as required by the second clause of section 242, that this deprivation of Carrera's rights actually resulted in bodily injury.

There are, in fact, two relevant bodily injury requirements. First, an excessive-force claim, like the one here, requires a showing of some bodily injury to establish a constitutional violation. *Harper v. Harris County, Texas*, 21 F.3d 597, 600 (5th

14

Cir. 1994).  Second, once an underlying constitutional violation is established and the prosecution invokes the second clause of section 242, it must prove resulting bodily injury in order to sustain punishment of more than one year.  18 U.S.C. § 242. Gonzales challenges only the government's evidence with respect to this second bodily injury requirement; however, the definition of "bodily injury" from excessive-force cases is still relevant here because this court has borrowed that definition for use in a section 242 prosecution also predicated on excessive force. *Brugman*, 364 F.3d at 618.

In constitutional excessive force cases we have applied a "some injury" which is "more than 'de minimis injury'" standard. *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999).  The injury necessary to satisfy this requirement, and thus to establish an excessive-force claim, is related to the amount of *force* that is constitutionally permissible in the context in which the injury occurs.  *Ikerd v. Blair*, 101 F.3d 430, 434–35. (5th Cir. 1996).  For example, in *Williams v. Bramer*, *supra*, this court faced the question whether the injury alleged, dizziness and shortness of breath, was sufficient to satisfy the "some injury" requirement.  We held that the injury was insufficient for the first choking incident, which occurred during a physical search, but was sufficient for the second choking incident, which occurred after the victim threatened to report the officer.  For

15

the second choking, dizziness and shortness of breath satisfied the "some injury" requirement because "the officer was motivated entirely by malice." *Williams v. Bramer*, 180 F.3d at 704. In contrast, the first incident occurred during a search, where "physical confrontation inevitably results." *Id.*

There is sufficient evidence here to support a rational jury finding of bodily injury. Carrera's mouth was foaming, he complained of stinging pain, and his eyes were swollen shut for at least three hours. The government introduced evidence that pepper spray causes "intense pain."[7] The force that caused this pain, the pepper spray, was applied in a context not too different from the second choking incident in *Bramer*. Carrera was no longer a threat to Gonzales. He was paralyzed, handcuffed, and lying on the floor of the bus. Accordingly, we hold that a rational trier of fact could have found that the evidence establishes, beyond a reasonable doubt, Gonzales's excessive-force conviction. *Cf. Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004) ("[I]t is clearly established that the Officers' use of pepper spray against Champion after he was handcuffed and hobbled was excessive.").[8]

---

[7]Gonzales advances the bizarre claim that pepper spray is a "non painful method of force," and, as evidence of pepper spray's soothing qualities, he cites capsicum's use in arthritis medicine. This evidence was never presented to the jury.

[8] It may be that *Brugman*, 364 F.3d at 618, misread *U.S. v. Harris*, 293 F.3d 863, 870 (5th Cir. 2003), as holding that, in a

Nor do we find any merit in Gonzales's contention, made only in passing (and partially on evidence not introduced before the jury but only at sentencing), that the evidence is insufficient because, even if it shows he intentionally pepper sprayed Carrera, it is not adequate to show that he knew the effects of the pepper spraying would be sufficiently severe to constitute "bodily injury." We conclude, however, that there was sufficient evidence from which the jury could reasonably infer any requisite

§ 242 felony prosecution involving a constitutional excessive force violation, the § 242 "bodily injury" requirement was the same as that for the constitutional excessive force violation. But, in *Harris* we expressly disclaimed consideration of the § 242 "bodily injury" requirement (because there "use of a dangerous weapon" made the offense a felony even if there were no bodily injury). *Harris* at 870 & n.6. In any event, with respect to count two here, which is an excessive force count, we are clearly bound by *Brugman*, likewise an excessive force case.

In part IIIC below, addressing counts three, four and five (deliberate indifference to serious medical needs), we apply to § 242 essentially the definition of "bodily injury" contained in 18 U.S.C. §§ 831(f)(5), 1365(h)(4), 1515(a)(5) and 1864(d)(2). That is largely the same definition as given in the trial court's charge here ("Bodily injury includes physical pain as well as any . . . impairment of a bodily function"), and no objection to that definition has been raised on appeal. The evidence here likewise suffices to establish "bodily injury" under this definition for purposes of count two.

Gonzales's reliance on *U.S. v. Lancaster*, 6 F.3d 208 (11th Cir. 1993), is misplaced. There the court affirmed the district court's finding that the "maced" victim had not suffered a "bodily injury" for purposes of U.S.S.G. § 2B3.1(b)(3), using the U.S.S.G. § 1B1.1 note 1(b) definition thereof as "any significant injury; e.g., an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought." *Lancaster* relied on the fact that "[t]he effect of the mace" on the victim "lasted minutes, not hours" and on deference to the trial court. *Id*. at 211. Here, by contrast, Carrera's eyes were swollen shut for at least three hours and we are asked to reverse, not affirm, the factfinder.

17

knowledge and intent on Gonzales's part.[9]

C. *Counts three, four and five, deliberate indifference*

Gonzales, Reyna, and Gomez each dispute the sufficiency of the evidence to support their convictions for the willful deprivation of Carrera's due-process right to be free from deliberate indifference to his serious medical needs (counts three, four, and five).

Under the Due Process clause, pretrial detainees enjoy a constitutional right "not to have their serious medical needs met with deliberate indifference on the part of confining officials." *See Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001)(defining the right under the Fourteenth Amendment's Due Process clause). Deliberate indifference, as defined in due process cases, requires both that the government official have "subjective knowledge of a substantial risk of serious harm to a pretrial detainee" and that the government official respond with "deliberate indifference to that risk." *Hare v. City of Corinth*, 74 F.3d 633, 650 (5th Cir. 1996)(en banc). Finally, if this due process right is willfully violated, and if bodily injury results, then the offender is guilty of a felony under section 242.

---

[9] Moreover, it is not clear that the section 242 "and if bodily injury results" clause can be invoked only if the defendant intended bodily injury. *See United States v. Hayes*, 589 F.2d 811, 820-21 (5th Cir. 1979).

18

*1. The officers had actual awareness*. There is sufficient evidence for a jury to have found that Officers Gonzales, Reyna, and Gomez were *actually aware* that Carrera had serious medical needs which posed a substantial risk of serious harm to him. Under the evidence, the jury could have so concluded from the very fact that this was so obvious. *Farmer v. Brennan*, 511 U.S. 825, 842-44 (1994).

All three defendants had close contact with Carrera while he lay handcuffed on the floor after his injury. Carrera made his injury known to the defendants, screaming "they broke me . . . Tell them to take me to a hospital" and the like. In response to his frequent pleas, the officers taunted him, calling him "cabron" and inviting people to wipe their feet on him.

At trial, the defense argued that Gonzales, Reyna, and Gomez believed Carrera was drunk and faking injury. Witnesses testified that it is common for detainees to feign injury in hope of avoiding immediate deportation; that other officers at the scene also believed Carrera was faking injury; and that it is extremely difficult for laymen to recognized the symptoms of quadriplegia.

But, two of the officers, Reyna and Gomez, were trained in trauma management and taught both how to identify the symptoms of spinal injury and how to treat those symptoms. Moreover, although some testifying officers did concede that they thought

19

Carrera was faking injury, those officers reminded the jury that the defendants were in close contact with Carrera and everyone else at the scene just believed what the defendants told them about Carrera's condition.

After the takedown, the three defendants had extended contact with Carrera: they dragged his limp body from the house to the van; they dragged him off the van and onto the bus; and they witnessed his reaction to being pepper sprayed. The jury could have easily inferred from both this close physical contact and Carrera's evident distress and frequent cries for help that the defendants knew he was seriously injured.

*2. Substantial risk of serious harm.* There is sufficient evidence for the jury to have found that Carrera faced a substantial risk of serious harm. The government need not prove that Carrera actually suffered serious harm. It is enough, for these purposes, that Carrera was exposed to a substantial risk of serious harm even if that harm never materialized. *See, e.g., Gates v. Cook*, 376 F.3d 323, 341 (5th Cir. 2004) (holding that a Eighth Amendment prisoner-civil plaintiff did not have to prove that he was actually injured by exposure to raw sewage, only that the exposure posed a serious health risk).

A defense witness, Dr. Hirshberg, testified that immediately upon being take down, Carrera's spinal facets locked and his spine was stable. Because of this stability, he explained, there

20

was no risk associated with dragging Carrera from the kitchen, to the van, to the bus.

The government's expert disagreed. Dr. Gitterle testified that Carrera might have benefited had he reached the hospital sooner and that, by moving Carrera without stabilizing him, the officers exposed him to a risk of harm. Furthermore, because excruciating pain also qualifies as a serious harm, the jury could have inferred that the defendant's failure to seek medical care for Carrera further exposed him to a substantial risk of increased severe pain. *See Harris v. Hegmann*, 198 F.3d 153, 159–60 (5th Cir. 1999). Moreover, after being pepper sprayed, Carrera was left alone on the bus floor, handcuffed, eyes swollen shut and foaming at the mouth, despite INS training that, due to the risk of potentially fatal asphyxiation, those pepper sprayed should be continually monitored and placed upright, never in a prone position, particularly if handcuffed.

*3. The officers responded with deliberate indifference to the risk.* There is sufficient evidence to permit a finding of deliberate indifference. Deliberate indifference is an extremely high standard to meet. *Domino v. Texas Dept. Crim. Justice*, 239 F.3d 752, 755 (5th Cir. 2001). The government "must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any

21

serious medical needs.'" *Id.* at 756.

Only Reyna disputes the sufficiency of the evidence with respect to deliberate indifference. We reject his contention that under the evidence it could not be found that he had any ability or opportunity to respond to Carrera's serious medical needs or to do anything looking to their alleviation.

*4. Bodily injury*. There is sufficient evidence to permit a finding of bodily injury. A finding of bodily injury is not required to establish deliberate indifference, the constitutional violation underlying counts three, four and five. However, as noted above, for a section 242 conviction to constitute a felony, bodily injury must result from the underlying violation.[10] With respect to count 2, the underlying violation was employment of excessive force and we followed *Brugman* and applied to section 242's "bodily injury" requirement the "some injury" test used in the excessive force cases. As explained in *Brugman*, what satisfies the "some injury" requirement varies according to the amount of force that was constitutionally permissible under the particular circumstances. *See Brugman*, 364 F.3d at 618-19. We decline to extend *Brugman's* approach to section 242 cases in which employment of excessive force is not any part of the underlying constitutional violation. *Brugman* is simply not

---

[10] Or the violation must have involved the use (or attempted or threatened use) of "a dangerous weapon, explosives, or fire," or "death results" from it, none of which is charged here.

22

meaningful in such a context. In a section 242 prosecution based on deliberate indifference to serious medical needs, use of force is no part of the underlying constitutional violation, and we accordingly do not apply *Brugman's* definition of "bodily injury."

We instead follow the First and Eleventh Circuits in applying to "bodily injury" as used in section 242 the definition of "bodily injury" provided in four other sections of Title 18 namely, "(A) a cut, abrasion, bruise, burn, or disfigurement; (B) physical pain; (C) illness; (D) impairment of a function of a bodily member, organ, or mental faculty; or (E) any other injury to the body, no matter how temporary." 18 U.S.C. §§ 831(f)(5); 1365(h)(4); 1515(a)(5); 1864(d)(2). *See United States v. Bailey*, 405 F.3d 102, 111 (1st Cir. 2005); *United States v. Myers*, 972 F.2d 1566, 1572 (11th Cir. 1992).

Applying this statutory definition of bodily injury, we hold that there was sufficient evidence to prove either "physical pain" or "impairment of function." The defendants argue that their failure to provide medical care for Carrera did not result in bodily injury because Carrera's injury was painless, instantaneous, and irreversible. The government, however, presented contrary evidence. Several witnesses, including several INS officers, testified that Carrera was moaning and complaining of severe pain. And, Dr. Gitterle testified that Carrera might have benefitted from treatment had he reached the

hospital sooner.

We hold that the evidence is sufficient to support all three deliberate-indifference convictions.

IV.  Confrontation Clause

Gonzales argues that the government violated his rights under the Confrontation Clause, as recently defined in *Washington v. Crawford,* 124 S.Ct. 1354 (2004), when it introduced evidence of statements Carrera made while in INS custody.

New constitutional rules are applied retroactively to all cases pending on direct appeal. *Griffith v. Kentucky*, 479 U.S. 314 (1987).  However, this does not affect the long-standing rule that, absent plain error, legal issues will not be addressed for the first time on appeal. *Johnson v. Unites States*, 520 U.S. 461 (1997) (applying the plain-error standard to an issue created by an intervening decision); *United States v. Rios-Quintero*, 204 F.3d 214, 215–16 (5th Cir. 2002).  Gonzales made no objection at trial to the complained of evidence, so our review is only for plain error.[11]

In *Crawford*, the Court held that the Confrontation Clause

---

[11] Gonzales did file a pre-trial motion in limine seeking to exclude evidence of some statements by Carrera as hearsay, but there is no indication that the district court ever made a definitive ruling thereon.  In order to preserve this issue for appellate review Gonzales was hence required to object at trial when evidence of Carrera's statements was offered.  *See* Fed. R. Evid. 103(a); *U.S. v. Duffaut*, 314 F.3d 203, 209 (5th Cir. 2002).

prohibits (1) testimonial out-of-court statements; (2) made by a person who does not appear at trial; (3) received against the accused; (4) to establish the truth of the matter asserted; (5) unless the declarant is unavailable and the defendant had a prior opportunity to cross examine him. *Crawford*, 124 S.Ct. at 1364–66. At trial, one of Carrera's roommates testified that while Carrera was lying on the kitchen floor he screamed, "oh, they broke me." Gonzales argues that because Carrera was in custody at the time, this statement (none other being specified by Gonzales in this connection) is inadmissible under *Crawford*.

The statement was admissible to prove that the officers had notice of Carrera's injury. The substance of the statement, that Carrera was broken, was never disputed. Furthermore, it is far from clear that this statement (or others by Carrera while at the scene) even qualifies as testimonial under *Crawford*. Although the definition of a "testimonial" statement was left open by *Crawford*, language in the opinion appears to suggest that a testimonial statement is one made during a governmental *interrogation* or something similar thereto, not merely screaming out in pain to those in the vicinity. *Crawford*, 124 S.Ct. at 1364 (noting definition of testimony as "a solemn declaration or affirmation made for the purpose of establishing or proving some fact" and observing that "[a]n accuser who makes a formal statement to government officers bears testimony"). Finding no

25

plain error, we reject Gonzales's Confrontation Clause challenge.

V.   Constructive Amendment of the Indictment

Gomez contends that Count Five of the indictment was constructively amended because he was indicted only for "denying" medical care but the jury charge and prosecution's theory of the case allowed conviction for "delaying or denying" medical care. Because nothing here turns on the distinction between delay and denial, and because the same set of facts is necessary to prove either, we reject this contention.

Gomez failed to object on this ground below.  The defense did object to the deliberate indifference jury instruction "in its entirety," but such general objections are insufficient to preserve constructive amendment error.  *United States v. Millet*, 123 F.3d 268, 272 (5th Cir. 1997).  Accordingly, we review Gomez's constructive amendment issue for plain error.  *United States v. Daniels*, 252 F.3d 411, 414 & n.8 (5th Cir. 2001).

The Fifth Amendment allows criminal prosecutions only on the basis of an indictment and only a grand jury may amend an indictment.  *Stirone v. United States*, 361 U.S. 212, 215–16 (1960).  An amendment can occur constructively when an action of either the judge or prosecutor allows the jury "to convict the defendant upon a factual basis that effectively modifies an essential element of the offense charged."  *United States v. Holley*, 23 F.3d 902, 912 (5th Cir. 1994); *United States v.*

26

*Salinas*, 654 F.2d 319, 324 (5th Cir. 1981). A jury cannot be permitted to convict on "an alternative basis permitted by the statute but not charged in the indictment." *Daniels*, 252 F.3d at 414. But an instruction which does not *broaden* the possible bases of conviction beyond what is embraced in the indictment does not constitute a constructive amendment. *United States v. Miller*, 105 S.Ct. 1811 (1985).

The "*delay* of medical care" and the "*denial* of medical care" are not alternative bases because the same facts can be used to convict under either. *See United States v. Chambers*, 408 F.3d 237, 243–44 (5th Cir. 2005). For the purposes of a deliberate-indifference claim, a deliberate delay in providing medical care is no different than a deliberate denial of the same care for the same time, and, in this context, no federal court has ever distinguished the two. An individual can fairly be said to have been "denied" medical care for a period of several hours even though he receives such care at the end of that period; conversely, it can with equal propriety be said that his receipt of the medical care was "delayed" for that period. Gomez's contention is essentially a verbal quibble.[12]

Because there was no error, much less plain error, we reject Gomez's contention that his indictment was constructively

---

[12] And, to the extent "delay" and "deny" are different in this context, the former is sufficiently embraced in the latter.

27

amended.

VI.  Deportation of Witnesses

Gonzales contends the government's deportation of witnesses, and the government's subsequent failure to produce these deported witnesses, violated his rights of compulsory process.[13]

Because Gonzales did not raise below his compulsory process objection to the government's deportation of witnesses his complaint is reviewed for plain error.  *United States v. Partida*, 385 F.3d 546, 557 (5th Cir. 2004).

It was not plain error to try Gonzales after the government deported two witnesses with material testimony.  The Sixth Amendment guarantees a criminal defendant compulsory process "for obtaining Witnesses in his favor."  U.S. CONST. amend. VI.  The Supreme Court has held that when the government deports an illegal alien, before defense counsel has an opportunity to interview the alien, the constitutional right of compulsory process is implicated.  *United States v. Valenzuela-Bernal,* 102 S.Ct. 3440 (1982).  The Court acknowledges, however, that there is tension between this Sixth Amendment right and the Executive Branch's responsibility to faithfully execute the immigration laws that require prompt deportation of illegal aliens.  The mere

_____

[13] Gonzales also claims this violated his confrontation rights.  That claim is clearly without any merit.  "Because the government did not use [the deported witness's] testimony at trial, in either live or recorded form, confrontation is not at issue here."  *United States v. Colin*, 928 F.2d 676, 679 (5th Cir. 1991).

28

fact that the government deports illegal alien witnesses, thereby making them unavailable to the defense, is not sufficient, standing alone, to show a violation of the Compulsory Process clause. *Id.* at 3449. In *Valenzuela-Bernal*, the Court struck a balance, holding that the Executive Branch was justified in "the prompt deportation of illegal alien witnesses once the Executive Branch made a good-faith determination that the witnesses possessed no evidence favorable to the defendant in a criminal prosecution." *Id.*

This circuit has not yet fully defined the contours of a claim under *Valenzuela-Bernal*. Other circuits have implemented the *Valenzuela-Bernal* holding in different ways. So far, drawing on explicit language from *Valenzuela-Bernal*, all of the Circuits require at least "a plausible showing that the testimony of the deported witness would have been material and favorable to [the] defense, in ways not merely cumulative to the testimony of available witnesses." *Valenzuela-Bernal*, 102 S.Ct. at 3449. This first prong is universal: the defendant must show prejudice to his case.

The Seventh, Ninth, and Tenth Circuits recognize a second prong: the defendant must establish that the government acted in bad faith. *United States v. Chaparro-Alcantara*, 226 F.3d 616, 624 (7th Cir.2000); *United States v. Pena-Gutierrez*, 222 F.3d 1080, 1085 (9th Cir.2000); *United States v. Iribe-Perez*, 129 F.3d 1167,

1173 (10th Cir.1997). These circuits draw upon the following language from *Valenzuela-Bernal*: "[I]mmigration policy adopted by Congress justifies the prompt deportation of illegal-alien witnesses upon the Executive's *good-faith* determination that they possess no evidence favorable to the defendant in a criminal prosecution." *Valenzuela-Bernal*, 102 S.Ct. at 3449 (emphasis added). There may be some disagreement on what it takes to show bad faith. In the Ninth Circuit, a defendant must show either (1) that the government departed from normal deportation procedures or (2) that it deported the witness to gain an unfair tactical advantage. *Pena-Gutierrez*, 222 F.3d at 1085. In the Seventh Circuit, a defendant must show "official animus" or a "conscious effort to suppress exculpatory evidence." *Chaparro-Alcantara*, 226 F.3d at 624. The focus is on "the Government's knowledge when . . . it arranged for the departure of the witnesses, not on any of its subsequent conduct." *Id.*

This court has adopted the first prong, requiring a showing of prejudice. *United States v. Soape*, 169 F.3d 257, 267–68 (5th Cir.1999) (denial of requested subpoena did not violate defendant's compulsory process rights because the defendant had not demonstrated the necessity of the witnesses testimony). In *United States v. Sierra-Hernandez*, 192 F.3d 501, 503 (5th Cir. 1999), this court discussed the first prong, acknowledged the existence of the second prong, and held there was no violation,

30

noting that neither prejudice nor lack of good faith was shown, but not expressly stating that the failure to show lack of good faith was of itself fatal to the claim.

Here, unlike our prior cases, the first prong is likely satisfied. Gonzales has made a plausible showing that the missing testimony, evaluated in the context of the entire record, would be (1) material and favorable to the defense, and (2) not cumulative. *Sierra-Hernandez*, 192 F.3d at 503. Two of the deported witness believed Carrera was faking injury. Because deliberate indifference requires that Gonzales know that Carrera was actually injured, this testimony may have been both favorable and noncumulative.

Gonzales does not, however, satisfy the second prong since the witnesses were deported in good faith. Two facts about Gonzales's case distinguish it from the vast majority of those that give rise to *Valenzuela-Bernal* claims. First, Gonzales's arrest occurred *after* the illegal aliens were deported. Second, Gonzales actually participated in deporting his own witnesses. Gonzales does not dispute that the deportations were done in good faith. He concedes that the government only became aware of exculpatory testimony after they deported the witnesses.

Because Gonzales cannot satisfy the second prong, he is not entitled to relief under the plain error standard. Whether this court ever adopts the second prong, requiring a showing of bad

31

faith by government officials, remains an open question that we do not decide today. If there is *Valenzuela-Bernal* error, it is not plain. *See United States v. Olano*, 113 S.Ct. 1770, 1776-77 (1993).

Gonzales also contends that the government's failure to produce alien witnesses violated his compulsory process rights. At an April 1, 2003 pre-trial hearing, Gonzales complained to the court of his difficulties locating witnesses in Mexico. The court responded, "the first thing you've got to do is sit down and make sure the government hasn't already provided the information . . . . If at the end of that exercise you still have issues, you can come back . . . ."[14] Gonzales never again raised the matter with the district court. The court's above noted ruling at the pre-trial hearing was not sufficiently definitive to preserve this claim, so plain error review is applicable. Gonzales's compulsory process rights were not plainly violated by the government's failure to produce deported witnesses. Compulsory process gives criminal defendants "the right to the government's assistance in compelling the attendance of favorable witnesses at trial . . . ." *Pennsylvania v. Ritchie*, 107 S.Ct. 989, 1000 (1987). Here, the witnesses were in Mexico, beyond the subpoena power of the federal district court. Nevertheless, the

---

[14] The court added, "based on what the government is telling us, it does sound as if all reasonable efforts and even some unreasonable ones may have already been taken."

United States Attorney produced information about every witness who was deported, located twelve of the twenty witnesses in Mexico, arranged for them to stay in the United States temporarily, and made them available to the defense for interviews three months before trial.  Under the circumstances, the government made fully reasonable efforts.  There is no plain error.

VII.  *Brady* Evidence

Gonzales contends the government withheld the following exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), : (1) that the pepper spray canister did not have a safety; (2) that Gonzales's holster did not have a trigger guard, (3) that a government witness, Gondinez, had made a prior inconsistent statement; and (4) that certain deported alien witnesses had testimony favorable to Gonzales.  Gonzales did not raise any of these objections at any time below.  If review is even possible, it is for plain error.  No such error is demonstrated.

None of the exculpatory evidence cited by Gonzales was actually withheld from him.  Gonzales had first-hand knowledge of the first two items, the safety characteristics of his pepper spray canister and his holster.  The other two items were provided to the defense in a tape recording.

Regardless, appellate review is impossible here.  Such *Brady*

33

challenges present fact-based judgments that cannot be adequately first made on appellate review. That is why Brady challenges must be brought to the district court's attention, winnowed by the trial judge, and made part of the record through a motion for new trial. *See United States v. Chorney*, 63 F.3d 78, 80-81 (1st Cir. 1995). *See also United States v. Jones*, 112 Fed. Appx. 343, 344 (5th Cir. 2004).

We decline to reverse on the basis of Gonzales's *Brady* claim.

VIII. Prosecutorial Misconduct

Gonzales contends that his due process rights were violated by the prosecutor's false statements made during rebuttal closing. Gonzales objected to these statements for the first time in his motion for new trial.

Gonzales argues two instances of prosecutorial misconduct. First, he asserts that the prosecutor "argued that accidental discharge [of the pepper spray] was impossible by virtue of [a] safety," even though the prosecutor "knew, or should have known," this to be false. Second, he argues that the prosecutor created a false impression of a cover-up conspiracy.

The Due Process clause of the Fourteenth Amendment forbids the government from knowingly using, or failing to correct, false testimony. *Giglio v. United States*, 405 U.S. 150, 153 (1972). To prove a Due Process violation, Gonzales must establish (1)

34

that there was false testimony, (2) that the government knew the testimony was false, (3) that the testimony was material. *United States v. Mason*, 293 F.3d 826, 828 (5th Cir.2002). This rule also applies to false statements made during the prosecutors rebuttal closing. *United States v. Williams*, 343 F.3d 423, 439 (5th Cir.2003).

However, the prosecutor's rebuttal closing contained no false statements. The prosecutor argued that "unless that [safety] tab was previously pulled, which there's no evidence before you, this thing cannot accidentally discharge." Evidence of the existence of a safety tab was elicited at trial both through testimony and with the introduction of INS training materials. *Post trial* defendant submitted affidavits stating that the safety tabs are on only during shipping and are removed before the pepper spray is issued to INS officers. Nevertheless, the prosecutor's rebuttal statement is still true—the canister cannot discharge unless the tab is removed.

To the extent that Gonzales's complaint is that the prosecutor misleadingly suggested that Gonzales's canister had a safety tab on it during the March 25, 2001 incident, the complaint was not properly preserved by objection at trial and is hence reviewed only for plain error.[15] We observe that Gonzales

---

[15] Gonzales (and his counsel) are clearly charged with knowledge whether the canister he carried on March 25, 2001 then had a safety tab (and whether it had a safety tab when issued to

35

does not allege that the prosecutor actually knew that the tabs were routinely removed before the canisters were issued to agents. Further, no witness testified at trial that the discharge was accidental or that the witness believed it was.[16] Gonzales's fellow INS agents testified that they saw the officers bring Carrera on the bus and that they did not see an accidental discharge when he was carried through the safety cage, and that they saw the officers exit the bus choking and laughing.

Gonzales also argues that the prosecutor improperly hinted at a cover-up conspiracy. During trial, the government impeached a defense witness with evidence that the witness, later in the day on March 25, 2001, after he knew of the events in question, had signed a form falsely accusing Carrera of assaulting Gonzales earlier that day. The form, entitled "Report of Assault On Service Employee[s]," listed "Richard Gonzales" as the "Officer Assaulted" and "Louis R. Gomez" as a "witness" and described the "weapon used by suspect" as "bullet key chain in hand." Later, in its closing argument, the government reminded jurors of this impeachment evidence and criticized the officer's eagerness to

---

him). Nor is there anything indicating that either lacked such knowledge. Gonzales was thus required to object at trial. *See Beltran v. Cockrell*, 294 F.3d 730, 736-37 (5th Cir. 2002).

[16] Gonzales testified at sentencing that the discharge was accidental. The district court enhanced his sentence for obstruction of justice in part on the basis that such testimony was knowingly false. Gonzales challenges the enhancement on this appeal but on grounds unrelated to whether his sentencing testimony could properly be found to have been knowingly false.

36

have assault charges brought against the quadriplegic victim.  No objection was made at trial.

Gonzales argues that the prosecutor knew that this INS form was for internal INS use only and that this form isn't ever forwarded to the Department of Justice.   The details of INS procedure are irrelevant to the validity of the prosecutor's point.   The witness submitted a form that INS agents use to report an assault; eventually another form is to be used to report the assault to the Department of Justice (and no such form was completed).   It's not prosecutorial misconduct to argue that steps were initiated to bring charges against Carrera.

Gonzales has demonstrated no plain error warranting reversal in the prosecutor's closing argument.

IX.  Ineffective Assistance of Counsel

For the first time on appeal, Gonzales argues that his trial counsel was ineffective because he failed to object when the prosecutor claimed that the pepper spray couldn't accidentally discharge unless the safety tab was removed. As a general rule, this court will not address, on direct appeal, Sixth Amendment claims of ineffective assistance of counsel that were not presented to the district court.  *United States v. Valuck*, 286 F.3d 221, 229 (5th Cir.2002).  There is no good reason to deviate from that general rule here.  We accordingly deny relief on this claim, but without prejudice to such rights as Gonzales may have in respect thereto in a proper motion under 28 U.S.C. § 2255.

37

X.  The Order of Closing Arguments

    Gonzales contends that the district court erred in how it ordered closing arguments.

    Closing arguments began Thursday afternoon.  There was discussion with the court as to whether to attempt to complete the arguments that afternoon.  The preference of all concerned seemed to be not to do so.  The defense attorneys asked that after the government's initial closing argument each defendant's counsel be allowed to make a part of his closing argument that afternoon and the balance of it Friday morning.  The government strenuously objected, insisting that at the least each defendant's argument should be completed before the argument of the next defendant began.  Defense counsel did not want to proceed in that fashion, nor did the defense want to postpone any defense arguments until Friday morning.  The court eventually acceded to the defense request; but, as compensation to the government, allowed it a "mini rebuttal" the first thing Friday morning, to be followed by the second segment of the argument of counsel for each of the defendants, after all of which would come the government's rebuttal.  Defense counsel's objection was overruled.  The closing arguments thus proceeded as follows: on Thursday afternoon, the government presented its opening closing argument for some sixty-five minutes; this was followed by some twenty-one minutes of argument by the attorney for Reyna, then by some twenty minutes of argument by an attorney for Gomez, and

38

finally by some thirty minutes of argument by the attorney for Gonzales. The court then, at about 5:00 p.m., recessed until Friday. Proceedings began about 9:00 a.m. Friday morning with approximately twenty-one minutes of "mini rebuttal" by another government attorney, followed by some thirty-eight minutes further argument by Reyna's counsel, then another some forty minutes' argument (in consecutive twenty-eight and twelve minute separate segments) by Gomez's two counsel, then some thirty minutes' argument by Gonzales's counsel, and finally followed by some twenty-six minutes of rebuttal argument by a third government attorney.[17]

Other than conclusorily stating that allowing the government "to go first and last" and "also to argue in the middle of defense counsel's closing arguments gives it unfair advantage," appellants point to no particular specific unfairness or prejudice to them in the ordering of the arguments, nor do they cite any authority in support of their contention. Their objection below was even more perfunctory.[18] It must be recalled that the defendants wanted to split each defendant's argument into two separate sections (instead of having the complete

---

[17] In all, three government attorneys argued in three segments for a total of some 153 minutes and four defense counsel argued in some seven segments for a total of about 179 minutes.

[18] Counsel for Gomez merely stated "we'd object for the record" and counsel for the other two defendants merely stated, respectively, "I join in that objection" and "I'll join in that as well."

argument of each defendant uninterrupted by that of any other party).  Appellants make (and made below) no complaint either as to the amount of time allowed or that the procedure, insofar as it deviated from the normal practice by giving the government a "mini rebuttal", allowed the government to raise new arguments to which the defense did not have an opportunity to reply (or that the government's opening was inadequate or incomplete).

As a general rule we review comparable trial management decisions for abuse of discretion.  *See United States v. Leal*, 30 F.3d 577, 586 (5th Cir. 1994) (time allowed for closing arguments).  However, Rule 29.1, Fed. R. Crim. P. (which appellants do not even cite) provides:

> "Closing arguments proceed in the following order:
>     (a) the government argues;
>     (b) the defense argues; and
>     (c) the government rebuts."

The Advisory Committee notes reflect that the main purpose of the rule is to ensure that "the defendant knows the arguments actually made by the prosecution in behalf of conviction before the defendant is faced with the decision whether to reply and what to reply."  This core interest under Rule 29.1 was not invaded here, and, while the simple order of Rule 29.1 should normally be followed, we are unable to conclude that the trial court abused its discretion in this respect or that the appellants were prejudiced or treated unfairly by the order of argument.  *See, e.g., United States v. Cardascia*, 951 F.2d 474,

40

485 (2d Cir. 1991); *United States v. Gleason*, 616 F.2d 2, 25-26 (2d Cir. 1979).

We overrule the complaint concerning the order of closing arguments.

## XI.  Co-conspirator Hearsay

Gonzales contends that the district court abused its discretion by admitting certain out of court statements.  Neither the objectionable statements nor the speaker is identified.  Such underdeveloped arguments in the appellant's brief are waived on appeal.  *United States v. Avants*, 367 F.3d 433, 442 (5th Cir. 2004).

## XII.  Predetermined Guilt

Gonzales contends that the district court predetermined his guilt and made a decision regarding admissibility of evidence accordingly.  Gonzales's argument is based entirely on one statement by the court which Gonzales plainly misunderstands.[19]

---

[19] [Defense Counsel]:  Richard Gonzales came up to Frank Gonzalez and said, "I just had an accidental discharge . . ."

[AUSA]:  Your Honor, it's hearsay.

[Defense Counsel]:  The hearsay is a state of mind of Mr. Gonzalez.

[The Court]:  How is it indicative of the state of mind, if it is—why is it relevant if it's not true?

41

The court was not excluding the proffered hearsay because it believed the statement was false; rather, the court was asserting, correctly, that the statement was being offered for the truth of the matter asserted.

XIII. *Booker*

Relying on *United States v. Booker*, 125 S.Ct. 738 (2005), Gonzales and Reyna both challenge their sentence enhancements. Gonzales also contends the district court erred by not considering all factors listed under 18 U.S.C. § 3553(a).

Because neither defendant raised these arguments below, review is for plain error only. *United States v. Mares*, 402 F.3d 511, 521 (5th Cir. 2005).

This court has held that "if the effect of the error is uncertain so that we do not know which, if either, side it helped the defendant loses." *Mares*, 402 F.3d at 521. The record must indicate that, had the court applied an advisory sentencing scheme rather than a mandatory one, it would have reached a different result more favorable to the defense. *Id.*

Neither Gonzales nor Reyna meets this burden. The district court sentenced Gonzales to the maximum imprisonment allowed by the guidelines. And, although Reyna was sentenced at the bottom of his guideline range, this fact alone is insufficient to show that the court, under an advisory scheme, likely would have reached a different result (and nothing else points to that

42

conclusion).  *United States v. Hernandez-Gonzalez*, 405 F.3d 260, 262 (5th Cir. 2005).

*Booker* held that the district court, treating the guidelines as advisory, should consider the factors listed in 18 U.S.C. § 3553(a).  Gonzales contends that the district court would have granted his motion for downward departure had it considered the factors listed in section 3553(a).  We reject this contention.  The district court did invoke section 3553(a) when it explained that "as to each of the defendants, the sentences imposed are consistent with the guideline sentencing objectives of punishment, incapacitation and deterrence."

XIV.    Sentencing: Two or More Participants

This court reviews the district court's findings of fact regarding sentencing factors for clear error.  *United States v. Mergerson*, 4 F.3d 337, 347 (5th Cir. 1993).  A factual finding is not clearly erroneous "as long as it is plausible in light of the record as a whole." *United States v. Holmes*, 406 F.3d 337, 363 (5th Cir. 2005).  We review the district court's interpretation and application of the sentencing guidelines *de novo*.  *United States v. Clayton*, 172 F.3d 347, 353 (5th Cir. 1999).  For sentences imposed pre-Booker and challenged post-Booker, these standards of review are unchanged.  *United States v. Villegas,* 404 F.3d 355, 359 (5th Cir.2005).

The Sentencing Guidelines provide for a base-offense level

of twelve if the defendant's offense involved two or more participants. *See* U.S.S.G. § 2H1.1(a)(2).  Finding multiple participants, the district court correctly applied this base offense level to each defendant.  U.S.S.G. § 2H1.1(a)(2). Gonzales and Reyna challenge this finding, arguing that (1) the crime of willful deliberate indifference to medical needs is a crime of omission, so it cannot involve multiple participants; (2) the defendants were not charged with conspiracy so they must have acted alone;  and (3) each defendant was acting independently.  The first two are questions of guideline interpretation, which we review *de novo*.  The last is a factual determination that we review for clear error.  *United States v. Ho*, 311 F.3d 589, 610 (5th Cir. 2002).

It is not determinative that the defendants were convicted of a crime of omission.   The commentary to section 2H1.1 defines "participant", in reference to section 3B1.1, as a person who is criminally responsible for the commission of the offense, but need not have been convicted.  U.S.S.G.  § 2H1.1 comment (n.2); U.S.S.G. § 3B1.1 comment. (n.1). By the plain text of the guideline, all three defendants, Gonzales, Reyna, and Gomez, qualify as participants since they are all criminally responsible for the same offense.

A defendant need not be charged with conspiracy to qualify for a multiple-participant enhancement.  As long as the

44

defendants participated knowingly in some part of the criminal enterprise, they need not even be convicted of the offense. *United States v. Glinsey*, 209 F.3d 386, 396 (5th Cir. 2000); U.S.S.G. § 2H1.1, comment 2.  We have upheld findings of multiple participants without an underlying conspiracy charge. *See, e.g.*, *United States v. Mersservey*, 317 F.3d 457, 464 (5th Cir. 2002).

Finally, the district court did not clearly err in finding that the defendants acted together.  The defendants were together in the kitchen when Carrera was complaining of injury, together at the Brazos County Jail when they dragged Carrera to the bus, and together on the bus when they pepper sprayed him.

We affirm the sentencing court's finding of two or more participants.

XV.   Sentencing: Organizer, Leader, Manager, or Supervisor

A factual finding that a defendant was an organizer, leader, manager, or supervisor under Sentencing Guideline §3B1.1(c) is reviewed for clear error.  *United States v. Turner*, 319 F.3d 716, 725 (5th Cir.2003).

It was not clear error for the district court to impose a two-level sentence adjustment because Gonzales was an "organizer, leader, manager or supervisor" of at least one of the other participants in the criminal activity.  U.S.S.G. §3B1.1(c). Gonzales was the team leader of the San Antonio unit, and according to everyone who testified at trial, the team leader of

the operation that led to Carrera's arrest.  Throughout the day, Gonzales issued orders to both Reyna and Gomez.  For example, Gonzales rejected the driver's suggestion that Carrera get medical attention before being moved; he ordered Carrera moved from the house to the van; he ordered Carrera moved from the van to the bus; and he communicated with Grace Winfrey, his INS supervisor in San Antonio about Carrera's condition.

Gonzales relies on *United States v. DeGovanni*, 104 F.3d 43 (3d Cir. 1997), in which the Third Circuit held that a supervising officer must participate in the criminal activity, not merely assume a de jure role in the police hierarchy. *DeGovanni* doesn't apply here because Gonzales both led and participated in the criminal activity.  Accordingly, we affirm the sentencing court's finding that Gonzales was a leader.

XVI.  Sentencing: Vulnerable Victim

The finding of vulnerability is a fact question that is reviewed for clear error.  *United States v. Brugman,* 364 F.3d 613, 621 (5th Cir.2004).

The district court's finding that Carrera was a vulnerable victim is plausible.  The Sentencing Guidelines provide for a two-level adjustment if the defendant should have known that the victim was vulnerable.  *See* U.S.S.G. § 3A1.1(b)(1). This vulnerability must be "an 'unusual' vulnerability which is present in only some victims of that type of crime."  *United*

*States v. Moree*, 897 F.2d 1329, 1335–36 (5th Cir. 1990). *See also*

*United States v. Angeles-Mendoza*, 407 F.3d 742, 747 n.5. (5th

Cir. 2005) (approving of the Ninth Circuit definition of

vulnerable victim as "one who is 'less able to resist than the

typical victim of the offense'"). Gomez argues that this

adjustment is inapplicable because it is only intended to punish

*targeting* a vulnerable victim. He argues that Carrera was not

vulnerable to begin with; instead, he was made vulnerable by the

offense.

The guidelines were amended in 1995 to clarify that there is

no targeting requirement. *United States v. Burgos*, 137 F.3d 841,

843–844 (5th Cir.1998) This court has "not required a specific

'targeting' of a vulnerable victim beyond the requirement that

the defendant knew or should have known of the vulnerability."

*Id.* Moreover, Carrera was vulnerable. He was quadriplegic, an

unusual vulnerability among section 242 victims.[20] Because

---

[20]The government, in reliance on *Lambright*, argues that Carrera was vulnerable merely because he was in custody. *United States v. Lambright*, 320 F.3d 517, 518 (5th Cir.2003). This theory of vulnerability is incorrect. In *Lambright*, where this court held that a prisoner who was assaulted while locked in his cell was vulnerable, the assault itself was the underlying constitutional violation. That violation was independent of, and made worse by, the fact that the prisoner was in custody. But here, the constitutional violation of deliberate indifference *depends* on Carrara being in custody: without custody there is no duty to provide medical care. Thus, the vulnerability of being in custody is not unusual to this type of crime; it is a prerequisite.

47

Carrera was paralyzed he was limited in the ability to seek help from other officers and was particularly at the mercy of the defendants. Accordingly, we affirm the sentencing court's finding that Carrera was a vulnerable victim.

XVII. Sentencing: Restraint of Victim

The finding of restraint is a fact question that is reviewed for clear error. *United States v. Brugman,* 364 F.3d 613, 621 (5th Cir.2004). The Sentencing Guidelines provide for a two level adjustment if the victim was physically restrained in the course of the offense. *See* U.S.S.G. § 3A1.3. Gonzales contends that the district court "double counted" by adjusting his sentence based both upon Carrera's restraint and his vulnerability. That Carrara was handcuffed is irrelevant, he argues, because Carrara couldn't move anyway.

The district court's finding that both restraint-of-victim and vulnerability adjustments were applicable is plausible in light of the record as a whole. There is evidence that Carrara, though paralyzed from the chest down, had some capacity for movement. It is plausible that because he was handcuffed behind his back, even this limited range of motion was taken away so, for example, his ability to wipe the pepper spray from his eyes was limited even further by handcuffs. We affirm the sentencing court's finding that Carrara was restrained.

XVIII. Obstruction of Justice

The district court's factual finding that Gonzales

48

obstructed justice is reviewed for clear error. *United States v. Holmes*, 406 F.3d 337, 363 (5th Cir.2005). "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole" and "[t]his is particularly true where a sentencing court's imposition of [an obstruction of justice] enhancement is based, at least in part, upon an evaluation of a witness' credibility." *Id.*

The district court imposed a two-level enhancement for obstruction of justice based on Gonzales's false testimony at the sentencing hearing and on his false statements to investigators, claiming accidental discharge of his pepper spray. The guidelines permit an enhancement for obstruction of justice "if the defendant willfully obstructed or impeded . . . the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1. Obstruction of justice includes "committing . . . perjury" and "providing materially false information to a judge." *Id.* at n.4(b)&(f). Thus, perjury at a sentencing hearing is a sufficient basis for an obstruction of justice enhancement. *United States v. Goldfaden*, 987 F.2d 225, 227 (5th Cir.1993). Obstruction of justice also includes giving a "materially false statement to a law enforcement officer that significantly obstructed . . . the official investigation." U.S.S.G. § 3C1.1, cmt. n.4(g).

49

Gonzales doesn't even challenge the obstruction of justice finding based on perjury at the sentencing hearing.  This finding, which is not clearly erroneous, alone would be sufficient for a section 3C1.1 enhancement.  We affirm the sentencing court's finding of obstruction.

XIX.    Amendment of the PSR

Gonzales challenges the district court's denial of his post-trial motion to amend and clarify the judgment and presentence report to more clearly reflect that the court did not find for sentencing purposes that Gonzales was guilty of aggravated assault or of use of a dangerous weapon and to require an amendment to the PSR expressly so stating.

Gonzales, who was sentenced on February 2, 2004, filed his notice of appeal on February 5, 2004.  On February 20, 2004, Gonzales filed his above described motion to clarify and to amend the PSR.  The district court denied the motion in a March 22, 2004 order.  Gonzales's February 5 notice of appeal obviously mentions neither the February 20 motion nor the court's ruling thereon, and Gonzales has neither filed a new notice of appeal nor amended the February 5 notice of appeal.  Consequently this matter is not properly before us.  See Fed. R. App. P. 3(c)(1)(B).  Contrary to Gonzales's contention, Fed. R. App. P. 4(b)(3)(B) & (C) are inapplicable because, even when liberally construed, Gonzales's February 20 motion is not one of the three

50

types of motions listed in Rule 4(b)(3)(A).[21]

## CONCLUSION

For the foregoing reasons, the judgment of the district court is


AFFIRMED.

---

[21] We note that in any event Gonzales's contention is clearly without merit.  The district court's written statement of reasons for sentencing (furnished to the Bureau of Prisons) applied a base offense level of 12 and specifically rejected paragraph 73 of the PSR (the focus of Gonzales's complaint) which relied on "aggravated assault" and use of "a dangerous weapon" to recommend a base offense level of 21.  As the district court's March 22, 2004 order states: "[t]he record available to the Bureau of Prisons makes clear that this court did not sentence Gonzales on the basis of aggravated assault or dangerous weapon."  The requirements of Rule 32(i)(3)(B) & (C) was adequately met.