# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 13, 2011

No. 09-41082

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

GERARDO GILBERTO RIVERA,

Defendant-Appellant

Appeal from the United States District Court for the
Southern District of Texas
USDC No. 2:04-cr-530

Before SMITH, BENAVIDES, and HAYNES, Circuit Judges.

PER CURIAM:[*]

In this criminal appeal, Defendant-Appellant Gerardo Gilberto Rivera challenges his conviction and sentence for possession with intent to distribute methamphetamine. For the following reasons, we AFFIRM.

### FACTUAL AND PROCEDURAL BACKGROUND

On September 22, 2004, Rivera was indicted on one count of possession with intent to distribute more than 500 grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). A three-day jury trial commenced on

---

[*] Pursuant to FIFTH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in FIFTH CIRCUIT RULE 47.5.4.

No. 09-41082

November 15, 2004. The majority of the government's case consisted of testimony by Border Patrol agents and Drug Enforcement Administration Task Force ("DEA") officers. Beyond Rivera himself, Rivera's nineteen-year-old daughter Sonja, Sonja's boyfriend, and a character witness testified for the defense.

The evidence presented at trial was as follows: In the early morning of Sunday, September 5, 2004, Rivera drove a 1998 white GMC Yukon ("Yukon") to the Border Patrol checkpoint in Sarita, Texas. Rivera was accompanied by his cousin-in-law, Carlos Soto-Torres ("Soto"). Border Patrol Agents Martinez and Salas were on duty at the Sarita checkpoint when Rivera arrived at approximately 3:45 a.m. In response to routine questions, Rivera stated that he was a United States citizen, that the Yukon belonged to him, and that he was traveling to Houston to purchase vehicles. Agent Martinez grew suspicious of Rivera because he avoided eye contact and had a "death grip" on the steering wheel.

After Rivera gave Agent Martinez permission to inspect the vehicle, Agent Martinez opened the rear driver's side door and looked under the seat. He observed that the bolt that secured the rear seat to the floor had tool markings. Meanwhile, Agent Salas, a canine handler, conducted a "free-air sniff" of the Yukon with his dog. The dog alerted to the presence of drugs at the rear undercarriage of the Yukon. Agent Martinez then got permission from Rivera to search his car in the secondary inspection area.

The agents observed that the Yukon was altered in several ways. The underside rear of the Yukon had a shiny unpainted and un-scratched area, had new screws, and the body of the vehicle had been raised from the frame. Upon lifting the carpet in the cargo area of the Yukon, Agent Salas saw fresh silicone or caulking, and noticed a chemical smell. He discovered a compartment underneath the floorboard behind the rear seat, accessible through a false floor

2

No. 09-41082

and trap door.    Inside the compartment were thirty-seven bundles of methamphetamine, worth $1.7 million, packed in Mexican-made Tupperware-type containers wrapped in plastic.  Also inside the Yukon was a toolbox with two of three tools necessary to access the trap door; the third tool was readily available at a hardware or auto parts store.

After the agents' discovery of the compartment, Defendant-Appellant Rivera and Soto were placed under arrest.  Border Patrol Agent Solis, a twelve-year veteran of the U.S. Border Patrol and a supervisor at the Sarita checkpoint, interviewed Rivera, but no recording or written statement was made.[1]  Rivera told Agent Solis that he was en route to Houston to purchase cars and that he had no knowledge of the drugs in the Yukon.  In Agent Martinez's presence, Rivera told Agent Solis that he had personally purchased the Yukon in Dallas about a month ago, but that he could not remember the name or address of the car lot or dealership.  When Agent Solis told Rivera that the DEA would subpoena the seller of the vehicle to identify the purchaser, Rivera stated that he did not actually personally travel to Dallas to purchase the vehicle.  Rather, his friend Vicente Flores ("Vicente"), who lived in Mexico, had purchased the vehicle in Dallas and brought it to Brownsville for Rivera.

In the evening of the same day, DEA Officers Bussey and Pacheco and Border Patrol Agent Baron took over the investigation and questioned Rivera, without making a recording or preparing a written statement.[2]  Officer Bussey testified at trial that Rivera gave the following version of events during this interview: Rivera told them that a month earlier he had purchased the Yukon from his friend Vicente.  He denied that he had told Agent Solis that he had gone to Dallas and purchased the Yukon himself.  Rivera explained that Vicente was

---

[1] The interview was conducted in Spanish.

[2] Officer Bussey conducted the interview in English while Officer Pacheco and Agent Baron translated into Spanish.

No. 09-41082

a used car salesman, and that Rivera had offered to purchase Vicente's Yukon in July 2004 for $6,900.[3] Vicente registered the Yukon in Rivera's name and delivered it to Rivera in Brownsville. According to the agents' testimony at trial, though Rivera had told Agent Solis that Vicente's last name was Flores, to Officer Bussey he stated that he did not know Vicente's last name, phone number, or address.

The agents were skeptical of Rivera's claim that he was en route to pick up a car with the Yukon because the vehicle lacked the standard equipment for that business – a tow bar. Additionally, Officer Bussey testified that Rivera could not provide the name or location of the vehicle auction or parking lot to which he was en route. Agents Martinez and Solis, and Officers Bussey and Pacheco all testified that they found Rivera's demeanor suspicious during questioning.

When he took the stand at trial, Rivera testified that he did not agree to a drug transaction with Vicente and that he did not know drugs were in his vehicle. Rivera denied telling the officers that he had bought the Yukon in Dallas. Rather, he insisted that he told them that the vehicle was purchased in Dallas and then brought to Brownsville. Rivera also testified that he gave Vicente's last name to the officers; that he told them the location of the lot where he was to meet Vicente in Houston – a parking lot by a Days Inn; that he had Vicente's number in his phone, but the screen had broken; and that he knew where Vicente lived, but not the address. Regarding his demeanor at the checkpoint, he denied that he had acted nervously and averted eye contact.

Rivera's statements to the agents and at trial regarding his whereabouts on September 4 were inconsistent. He had told Officer Bussey that he drove to

---

[3] Rivera owed Vicente a balance of $450, but could not explain how he would contact him, other than to meet him at a parking lot in Houston that day as he said they had planned to do.

4

No. 09-41082

Mexico on September 4, 2004 in his red Plymouth Breeze, leaving his home in Brownsville at about 10:00 a.m. and returning at about 10:30 p.m. that same day.  At trial, however, he testified that on September 4, 2004, he left his home around 11:00 a.m. or noon and drove his Breeze to a McAllen car lot, where he purchased a car.  He said that he returned home around 3:30 p.m. or 4:00 p.m.  After 5:00 p.m., Rivera's son and Sonja's boyfriend borrowed the Yukon to go to the mall, according to both Rivera's and Sonja's testimony.

Certain aspects of Rivera's version of events did remain consistent.  He repeatedly said that he received the Yukon and the registration papers from Vicente sometime between August 7 and 11, and that about two weeks later, he re-registered the Yukon and changed its license plates in Brownsville.  By all accounts, he also consistently stated that Vicente had borrowed the Yukon on Thursday, September 2, 2004, and returned it on Friday, September 3, 2004, at around 6:00 p.m.  During questioning by Officer Bussey and at trial, Rivera said that between 5:00 p.m. and 6:00 p.m. on September 4, he drove the Yukon to an autoparts store in Brownsville.[4]  In addition, Rivera's statements and Soto's testimony were consistent that he picked up Soto in Mexico around midnight on September 4, and then returned to his home in Brownsville, where they got into the Yukon.

At the close of the government's case, and again after the government's rebuttal, Rivera moved for judgment of acquittal based on insufficiency of the evidence. The district court denied the motion both times. After deliberating for one-and-a-half days, and sending five jury notes, the jury found Rivera guilty as charged.

Within seven days of the jury verdict, Rivera filed a motion for new trial pursuant to Fed. R. Crim. P. 33(b)(2), based on the prosecutor's erroneous

---

[4] This despite Rivera having also told Officer Bussey that he was in Mexico all day on September 4.

5

No. 09-41082

statement at closing argument that the evidence proved Rivera had not registered the Yukon in Brownsville.

On June 9, 2005 the district court sentenced Rivera to 235 months in prison followed by five years of supervised release. At the sentencing hearing, Rivera's counsel argued that the Pre-sentence Report's ("PSR) recommended sentence was greater than necessary to meet the goals of sentencing.

Rivera appealed his conviction and sentence on June 17, 2005, but this Court dismissed his appeal for failure to timely pay the docketing fee. On October 21, 2005, the district court issued a written order stating its reasons for denying Rivera's motion for a new trial.

In February of 2006, the district court sent notice that the trial exhibits would be destroyed unless the parties removed them by February 28. The government withdrew its exhibits, but defense counsel did not respond, and the defense's trial exhibits were destroyed.

Rivera filed a *pro se* petition for a writ of habeas corpus on April 24, 2009, arguing that his trial counsel had been ineffective for failing to prosecute his appeal and failing to inform him that his appeal had been dismissed. After an evidentiary hearing, the district court re-entered its judgment against him and dismissed his petition without prejudice. Rivera timely appealed the dismissal of his petition for a writ of habeas corpus. On March 31, 2010, this Court granted Rivera's unopposed motion to remand the case to the district court for the purpose of reconstructing the missing trial exhibits. The parties were unable to reconstruct any of the defendant's trial exhibits, but did manage to do so for some of the government's trial exhibits.[5]

---

[5] While the government's trial exhibits had not been destroyed, many of them were missing when Rivera filed his motion for a writ of habeas corpus.

No. 09-41082

## ANALYSIS

Rivera makes four arguments in support of his appeal. First, he maintains that the destruction of a substantial portion of the trial exhibits prior to this appeal, including all of the defense exhibits, requires reversal of his conviction and a new trial. Second, he argues that the evidence was insufficient to sustain a conviction. Third, he contends that the district court abused its discretion when it denied Rivera's motion for a new trial based on the prosecutor's misstatement of evidence outside the record during closing arguments. Fourth, he claims that the district court imposed an unreasonable sentence. This Court will address Rivera's arguments in turn.

### 1.  Destruction of Exhibits

Rivera contends that the omission of all nine defense exhibits and twenty-five government exhibits constitutes "substantial and significant" omissions from the record, requiring reversal. The government responds that the absence of these exhibits is not a substantial or significant omission in the record because the record still contains the information found in the missing exhibits. The government's argument prevails.

If a defendant is represented by different counsel on appeal than at trial, the absence of a "substantial and significant portion of the record" is sufficient to warrant reversal for a new trial. *United States v. Selva*, 559 F.2d 1303, 1306 (5th Cir. 1977) (reversing conviction because the record did not contain a transcript of the closing arguments made by defense or government counsel at trial, and information about the closing arguments was unavailable to the attorney on appeal). "There can be no substantial and significant omissions from a reconstructed record if, taken as a whole, it accords effective review on appeal." *United States v. Preciado-Cordobas*, 981 F.2d 1206, 1213 (11th Cir. 1993). "We do not advocate a mechanistic approach to situations involving the absence of a complete transcript of the trial proceedings. We must, however, be able to

7

conclude affirmatively that no substantial rights of the appellant have been adversely effected by the omissions from the transcript." *Selva*, 559 F.2d at 1306. Litigants in such a position "are under no burden to show specific prejudice in order to obtain relief." *Id.* at 1305 (explaining no showing of prejudice is required since the new attorney on appeal cannot tell if an error was made during the earlier, unrecorded proceedings).

In this case, the nine missing defense exhibits consist of photographs of the Yukon and its secret compartment. The twenty-five missing government exhibits include a stipulation of laboratory reports; photographs of the stacked drugs, the truck and its compartment, and relevant tools and hardware; the actual tools and hardware; and a chart of the Border Patrol area. The reconstructed record contains several photographs of the Yukon's cargo area and compartment, and thus the absence of those Rivera exhibits is not significant. In addition, Rivera acknowledges that defense counsel cross-examined the agents extensively on the hidden compartment and the appearance of the rear interior of the Yukon where the compartment was found, and that testimony is in the record. The agents stated that the rear of the Yukon was virtually indistinguishable from one which has not been altered.

Rivera argues that the fact that defense counsel cross-examined the government's witnesses regarding the Yukon indicates that the exhibits' omission is substantial. This claim is premised on the mistaken understanding that "the missing exhibits were used to prove an element of the offense–knowledge–that went to the heart of the government's case and Mr. Rivera's defense." However, the government's witnesses conceded that the compartment was almost undetectable, and the government does not argue that obvious alterations to the Yukon were one of the factors indicating guilty knowledge. Thus, the appearance of the compartment, and by extension the Yukon itself, did not play a significant or substantial role in the jury's

8

determination that Rivera knew that he was transporting drugs. Furthermore, the available record contains ample information regarding the compartment's placement and appearance in the Yukon. Thus, the exhibits' omission is neither substantial nor significant. *See United States v. Gieger*, 190 F.3d 661, 667 (5th Cir. 1999) (finding that omission from the record of seventy-two bench conferences during the course of trial was not a substantial and significant omission because the conferences were administrative in nature, "permitted to allow further argument on evidentiary objections,"and "[o]bjections to the court's rulings following these bench conferences [made] the arguments leading up to the rulings unimportant to the record on appeal," or concerned counts for which the defendants were acquitted); *Preciado-Cordobas*, 981 F.2d at 1214 (finding that, where missing parts of the record were adequately reconstructed, "[m]ere speculation, entirely unsupported or contradicted by the record, that error may have been committed during an unrecorded part of the trial simply is not enough to support a finding that omissions are substantial and significant.").

Rivera also claims that this Court cannot review the sufficiency of the evidence without considering all of the evidence presented at trial. If that were the rule, then *Selva* and its progeny would not exist, because the absence of any portion of the record would automatically require reversal. What Rivera really wants is not for this Court to review the sufficiency of the evidence, but to re-evaluate that evidence and find that the jury's verdict was wrong. However, it is not our place to reweigh the evidence, and "[w]e must not substitute for the jury's reasonable factual inferences other inferences that we may regard as more reasonable." *McBeth v. Carpenter*, 565 F.3d 171, 176 (5th Cir. 2009).

Though cases do not usually involve the loss of so many exhibits, the quantity of missing exhibits is irrelevant to the question of significance and substantiality. Here, the record as a whole affords effective appellate review.

No. 09-41082

We thus find that reversal is unnecessary on the ground of destruction of evidence.

## 2. Sufficiency of the Evidence

Rivera next argues that the district court erroneously denied his motion for judgment of acquittal, because the evidence presented at trial was insufficient to prove beyond a reasonable doubt that he had knowledge of the drugs hidden in the Yukon. The government responds that the circumstantial evidence of Rivera's knowledge of the drugs was sufficient; we agree.

This Court "review[s] de novo the district court's denial of a motion for judgment of acquittal." *United States v. Carbajal*, 290 F.3d 277, 289 (5th Cir. 2002). The Court must "examin[e] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the verdict, and ask[] whether a rational trier of fact could have found the element of knowledge of possession beyond a reasonable doubt." *United States v. Gonzalez-Rodriguez*, 621 F.3d 354, 360 (5th Cir. 2010). *See also Jackson v. Va.*, 443 U.S. 307, 319 (1979) ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."). "The evidence need not exclude every reasonable hypothesis of innocence and the jury is free to choose among reasonable interpretations of the evidence." *United States v. Brugman*, 364 F.3d 613, 615 (5th Cir. 2004).

Rivera only challenges the knowledge element of his conviction.[6] When drugs are discovered in a vehicle while the defendant exercises control over it, and the drugs are hidden in a secret compartment, "guilty knowledge may not be inferred solely from the defendant's control of the vehicle."

---

[6] To possess a controlled substance with the intent to distribute, the defendant must (1) knowingly (2) possess a controlled substance (3) with the intent to distribute that substance. *See United States v. Garcia-Flores*, 246 F.3d 451, 454 (5th Cir. 2001).

10

*Gonzalez-Rodriguez*, 621 F.3d at 361.  There "is at least a fair assumption that a third party might have concealed the controlled substances in the vehicle with the intent to use the unwitting defendant as the carrier in a smuggling enterprise."  *United States v. Resio-Trejo*, 45 F.3d 907, 911 (5th Cir. 1995) (quotation marks and citation omitted).  Therefore, "[i]n secret compartment cases, this Court requires additional circumstantial evidence that is suspicious in nature and demonstrates guilty knowledge."  *Gonzalez-Rodriguez*, 621 F.3d at 361 (finding sufficient evidence in a secret compartment case where 312 pounds of methamphetamine were concealed in the back of a load of grapefruits in a freightliner; there was a suspicious time gap in travel between the loading and delivery points of the freighter; there was evidence the log book had been falsified; and there was a heavier lock than that typical for such a trailer, to which the driver had the key).  In the past, we have recognized the following types of behavior as circumstantial evidence of guilty knowledge: "(1) nervousness;  (2) absence of nervousness, i.e., a cool and calm demeanor; (3) failure to make eye contact; (4) refusal or reluctance to answer questions; (5) lack of surprise when contraband is discovered;  (6) inconsistent statements; (7) implausible explanations; (8) possession of large amounts of cash; and (9) obvious or remarkable alterations to the vehicle, especially when the defendant had been in possession of the vehicle for a substantial period of time."  *United States v. Reyna*, 148 F.3d 540, 544 (5th Cir. 1998) (citations omitted) (reversing conviction for lack of sufficiency of circumstantial evidence of knowledge on a finding that defendant's composure, $700 in cash, and slightly oversized tire "permitted conclusions of both guilt and innocence that are essentially in balance," resulting in reasonable doubt for a rational juror).

The government relies on the following circumstantial evidence of Rivera's guilty knowledge: (1) Rivera's inconsistent or implausible statements regarding his acquaintance with Vincente Flores, his activities the day before the offense,

and his purchase of the Yukon; (2) his demeanor at the checkpoint and during police questioning; and (3) the high value of the methamphetamine in the Yukon.

### a. Inconsistent statements to customs officials

This court has held that "[p]erhaps the strongest evidence of a criminal defendant's guilty knowledge is inconsistent statements to federal officials," because "a factfinder could reasonably conclude that they mask an underlying consciousness of guilt." *United States v. Diaz-Carreon*, 915 F.2d 951, 954-55 (5th Cir. 1990) (finding that nervousness, inconsistent stories, and implausible explanation of how defendant acquired the truck constituted sufficient circumstantial evidence of knowledge).

As detailed *supra*, the agents testified that Rivera changed his story regarding his knowledge of Vicente Flores. They also testified that Rivera gave inconsistent statements regarding his activity in the period leading up to his stop at the Sarita checkpoint on the early morning of September 5. Officer Bussey testified that Rivera told him that on Saturday, September 4, at 10:00 a.m. he drove to Mexico in his Plymouth Breeze and returned around 10:30 p.m. At trial, however, Rivera testified that he spent most of the day in McAllen, Texas with Sonja, where they eventually bought her a car. He also testified that he drove the Yukon to an auto repair store in Brownsville between 5:00 and 6:00 p.m. on September 4, but a lane check of the Yukon reflected that it entered the United States from Mexico at 6:59 p.m.[7] Officer Bussey testified that Rivera had stated that Soto had accompanied him so that Soto could visit his sister in Houston. Soto, on the other hand, testified that Rivera had asked him to come along to help haul cars, and that he would visit his sister, "if there was an opportunity." Rivera also testified that he had invited Soto to help haul cars.

---

[7] Officer Bussey admitted, however, that the license plate scanner at the lane check does not identify either the type of vehicle or the driver.

No. 09-41082

Finally, Rivera's statements regarding his purchase of the Yukon were somewhat inconsistent. Agent Solis testified that Rivera said that he purchased the Yukon in Dallas, but he did not remember the name or address of the car lot or dealership. When Agent Solis told Rivera that the DEA would subpoena the seller of the vehicle to identify the purchaser, Rivera changed his story, stating that Vicente had purchased the vehicle in Dallas and had brought it to Rivera in Brownsville. Officer Bussey testified that Rivera told him that he purchased the Yukon after he saw Vicente driving it. Rivera testified that the Yukon had been purchased in Dallas and brought to Brownsville, and he denied that he had ever stated otherwise. Rivera argues that all three times he merely meant to explain that the car was originally from Dallas. In addition, a certified copy of the Yukon's title history identified the Yukon's owner as Rivera with a Brownsville address, and the previous owner as Exchange Auto Sales in Garland, Texas. Officer Bussey testified that Exchange Auto Sales had closed down more than a year before Rivera purchased the vehicle, and a former Exchange Auto Sales mechanic testified that he did not sell a 1998 white Yukon.

Rivera's testimony at trial contradicted that of the agents and officers. The jury was under no obligation to believe Rivera and it was entitled to credit the agents' testimony, even without a recording of the post-arrest statements. *See United States v. Morin*, 627 F.3d 985, 999 (5th Cir. 2010) ("Although no recording was made of the initial DEA interview, and Morin contends that there are no inconsistencies between what he told the agents originally and his testimony at trial, the jury was entitled to credit the DEA agents' testimony and reject Morin's testimony.").

### b. High value of drugs

Also indicative of Rivera's guilt is the fact that he was transporting fifty-four pounds of methamphetamine worth approximately $1.7 million. A jury could reasonably infer that Rivera "would not have been entrusted with such a

large amount and high value of methamphetamine unless he knew he was part of the drug trafficking scheme." *Gonzalez-Rodriguez*, 621 F.3d at 362; *see United States v. Villarreal*, 324 F.3d 319, 324 (5th Cir. 2003) (finding jury could reasonably infer knowledge from presence of drugs worth $300,000). Rivera contends that this argument is undermined by the fact that the prints on the wrapping of the methamphetamine were not his. However, the jury could have reasonably believed that another party loaded the methamphetamine packets into the Yukon, and Rivera then drove the truck.

### c. Demeanor

Rivera's body language at the checkpoint and during police questioning also offers circumstantial evidence of guilty knowledge. Agent Martinez testified that Rivera appeared nervous because he maintained a "death grip" on the steering wheel, his leg was continuously moving, and he would not make eye contact with the agents. *See United States v. Gutierrez-Farias*, 294 F.3d 657, 660 (5th Cir. 2002) (finding rational jury could have inferred guilty knowledge from the fact that "one of the agents at the checkpoint testified that Gutierrez appeared nervous, even before he was directed to the secondary inspection area"). Other circumstantial evidence of guilty knowledge came from the testimony of Agent Solis and Officers Bussey and Pacheco that Rivera did not look at the agents when questioned, hesitated in his answers, and kept his arms either crossed or in his pockets. *See United States v. Richardson*, 848 F.2d 509, 513 (5th Cir. 1988) (defendant's "nervousness when going through the fixed checkpoint . . . [was] suggestive of guilty knowledge"). In contrast, the agents found Soto trustworthy because he was forthcoming in his responses to questions and looked them in they eyes.

Rivera testified that he was not nervous and denied that he had avoided eye contact with the agents and officers. He also testified that when he was being interrogated by the DEA, Agent Solis came into the room and began

cursing and yelling at him, which Agent Solis and Officer Bussey denied.  Soto testified that Mr. Rivera appeared calm and normal, although "serious" when he was told about the drugs in the vehicle.  Again, it was the jury's prerogative to credit the agents' testimony, and to disbelieve Rivera and Soto.

Viewed in the light most favorable to the verdict, Rivera's inconsistent statements and suspicious demeanor, combined with the high value of the methamphetamine, are sufficient to indicate guilty knowledge.  Therefore,  the government presented adequate circumstantial evidence for a reasonable jury to find Rivera guilty of possession of the methamphetamine with intent to distribute it.

### 3. Prosecutor's Misstatement of Evidence

Rivera argues that the district court abused its discretion by denying his motion for a new trial based on a misstatement of facts outside of the record made by the prosecutor during her closing argument.  The government responds that the factual error in the prosecutor's closing argument did not affect substantial rights.

This Court reviews the district court's denial of a motion for new trial for abuse of discretion.  *Villarreal*, 324 F.3d 319, 325 (5th Cir. 2003).  In reviewing the denial of a motion for new trial, this Court does "not revisit evidence, reevaluate witness credibility, or attempt to reconcile seemingly contradictory evidence."  *United States v. Tarango*, 396 F.3d 666, 672 (5th Cir. 2005).

A district court may grant a defendant's motion for new trial "if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "The remedy of a new trial is rarely used; it is warranted 'only where there would be a miscarriage of justice' or 'where the evidence preponderates heavily against the verdict.'"  *United States v. O'Keefe*, 128 F.3d 885, 898 (5th Cir. 1997) (quoting *United States v. Andrade*, 94 F.3d 9, 14 (1st Cir. 1996).  A court will grant a  new trial "only upon demonstration of adverse effects on substantial rights of a defendant."

No. 09-41082

*United States v. Wall*, 389 F.3d 457, 467 (5th Cir. 2004). *See also United States v. Azubike*, 504 F.3d 30 (1st Cir. 2007) (vacating conviction and sentence and remanding where prosecutorial misstatements occurred twice and strongly emphasized incorrect evidence, the misstatements were deliberate, and the defense objected). "In determining whether the prosecutor's remarks affected a defendant's substantial rights, the trial court should consider (1) the magnitude of the prejudicial effect of the statements; (2) the efficacy of any cautionary instructions; and (3) the strength of the evidence of defendant's guilt." *Wall*, 389 F.3d at 474.

At issue here is the effect of an erroneous statement regarding the Yukon's registration made by the prosecutor in her closing argument. Defense counsel at both the trial and appellate levels concede that there was no prosecutorial misconduct and that the prosecutor's misrepresentation was made in good faith. During closing, the prosecutor attacked Rivera's credibility, asserting that he told different stories to different agents regarding his purchase of the Yukon and his activities on the day before his arrest. She also stated: "This is a very interesting set of paperwork . . . You heard the Defendant testify that he re-registered [the Yukon] and got another license plate and you're going to see where that was done. And it wasn't Brownsville, Texas." This statement referred to a receipt from Rivera's re-registration to obtain new license plates for the Yukon, which the government had entered into evidence. This receipt contained the following language on the second line: "REG CLASS 25 $52.80 DALLAS CNTY," and on the eighth line: "LAST ACTIVITY 08/23/2004 REPL OFC: 031 AR."[8]

---

[8] The prosecutor had also cross-examined Rivera's testimony about changing the license plates:

> PROSECUTOR: Well, did you personally go and buy the new license plate?
> MR. RIVERA: Yes.
> PROSECUTOR: And where did you go?

No. 09-41082

On its second day of deliberation, the jury sent the district court the following note: "The Title and Vehicle Registration (exhibit 2 pg 2) states on second line: DALLAS CNTY. Could he have picked up the plates in Brownsville with it reading Dallas County?" The district court responded that this was a fact question to be answered by the jury, not the court. After the guilty verdict, Rivera's counsel confirmed with the Texas Department of Transportation that code "OFC: 031" on the receipt identified the office location of the Yukon's re-registration as Brownsville. Defense counsel therefore moved for new trial, based on the prosecutor incorrectly stating that the evidence showed Rivera had not re-registered the Yukon in Brownsville. The district court held three hearings on the motion, and in a written order denied Rivera's motion, explaining that the other evidence of Rivera's guilt, including other inconsistent statements, "demonstrates to the Court that a miscarriage of justice has not occurred."

We find that the district court did not abuse its discretion in ruling that the prosecutor's misstatement did not affect Rivera's substantial rights. Undoubtedly, Rivera's credibility was a key issue in this case because one of the main pieces of circumstantial evidence of his guilt was the agents' testimony that Rivera had changed his story. However, it was within the district court's discretion to determine that this one misstatement of fact regarding the location

---

MR. RIVERA: To the court.
PROSECUTOR: Where?
MR. RIVERA: In Brownsville.
. . .
PROSECUTOR: So, if there's a receipt in the title history where this was bought out of Dallas County . . .
MR. RIVERA: What, the truck?
PROSECUTOR: For the truck, for the new license plate.
MR. RIVERA: I do not know. I just went to the court.
PROSECUTOR: Okay. That's fine.

of Rivera's re-registration, which could have undermined his credibility, did not affect Rivera's substantial rights.

First, regarding the prejudicial effect of the misstatement, the prosecutor did not emphasize the place of re-registration in her closing argument, or in her cross examination. Instead, the focus of the closing argument was on Rivera's inconsistent statements and allegedly implausible accounts regarding how and where he initially purchased the Yukon and what he did the day before the offense. The prosecutor did cross-examine Rivera about the re-registration, but it was not key evidence. Furthermore, other evidence of Rivera's inconsistent statements was extensive. The district court therefore could conclude that one additional example of a conflicting statement by Rivera did not have a strong prejudicial effect on the jury.

The jury's note asking whether the title registration document eliminated the possibility that Rivera picked up the plates in Brownsville did not prove that the misstatement had a strong prejudicial effect, either. While the face of the exhibit states Dallas County, which reasonably could have led the jury to believe that the re-registration occurred in Dallas, the jury note could also indicate that they found the evidence unclear and did not consider it. The government observes that the jury's note explicitly refers to the government exhibit, rather than the closing argument. Furthermore, as the government points out, this note was just one of five sent by the jury.[9]

Additionally, as detailed *supra*, there was other circumstantial evidence of Rivera's guilt, including his demeanor at the checkpoint and the amount of drugs in the Yukon.

---

[9] The government also contends that the court's general instruction to the jury that attorneys' statements during closing argument do not constitute evidence undid the effect of the erroneous statement. However, because the court gave its instruction before the closing arguments, it could not serve to neutralize any prejudice caused by the misstatement. See *United States v. McPhee*, 731 F.2d 1150, 1153 (5th Cir. 1984).

No. 09-41082

Rivera contends that his was a close case, as exhibited by the fact that the jury deliberated for two days, and that the district court stated at the sentencing that "the jury may have convicted an innocent man." However, a two-day deliberation is not necessarily indicative of the weight of the evidence against Rivera, as many factors contribute to the length of a jury's deliberations. And, if the district judge had truly thought that Rivera was innocent, then he would not have rejected his motion for new trial. In this case, the judge's actions speak louder than his words.

The prosecutor's remark here was isolated and not emphasized, was made in good faith, and Rivera did not object to it during the closing argument. Moreover, the evidence of Rivera's guilt was ample. We thus find that the district court acted within its discretion in denying the motion for new trial because there was no miscarriage of justice. *See Wall*, 389 F.3d at 474 (finding that, "given the lack of bad faith on the part of the government, and given the considerable evidence of Wall's guilt, Wall failed to demonstrate that the prosecutor's remarks amounted to a miscarriage of justice").[10]

### 4. Reasonableness of Sentence

Finally, Rivera argues that his 235-month sentence should be vacated and remanded for reconsideration because it was imposed before the Supreme Court's decisions in *Gall* and *Kimbrough*, and it is greater than necessary to effectuate the purposes of sentencing under 18 U.S.C. § 3553(a), making it unreasonable. The government responds that a summary remand is unnecessary because there is no indication that the district court was

---

[10] *United States v. Earle*, 375 F.3d 1159 (D.C. Cir. 2004) and *United States v. Watson*, 171 F.3d 695 (D.C. Cir. 1999), cited by Rivera, are inapposite. The District of Columbia Circuit reversed in those cases because the defendants were prejudiced by prosecutorial remarks that knowingly misstated the evidence during closing argument. Here, there was little prejudice to Rivera, and Rivera conceded that the prosecutor did not knowingly misstate the evidence.

constrained by overruled precedent, and the district court properly considered the § 3553(a) factors.

Following *United States v. Booker*, 543 U.S. 220 (2005), sentences are reviewed for reasonableness in light of the sentencing factors in 18 U.S.C. § 3553(a). *United States v. Mares*, 402 F.3d 511, 519-20 (5th Cir. 2005). This includes a review of both the substantive and procedural reasonableness of the sentence. *United States v. Delgado-Martinez*, 564 F.3d 750, 752 (5th Cir. 2009). Appellate arguments that were not raised in the district court are reviewed under the plain error standard of review. *See United States v. Peltier*, 505 F.3d 389, 391-92 (5th Cir. 2007).[11] Under that standard, this court may correct the sentence imposed only if "(1) there is error . . . ; (2) it is plain; and (3) it affects substantial rights." *Id.* at 392. In addition, the error must seriously affect "the fairness, integrity or public reputation of judicial proceedings." *Id.* (internal quotation marks and citation omitted). An error that affects substantial rights is one for which there is "'a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different.'" *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

Here, in its PSR, the Probation Office calculated Rivera's base offense level as 38 because the offense involved a net weight of 11.02 kilograms of methamphetamine (actual). *See* U.S.S.G. § 2D1.1(c)(1). Since Rivera had no prior criminal history, he fell into the lowest criminal history category of I. The advisory guideline range was 235 to 293 months, the statutory minimum was 10 years, and the statutory maximum was life. *See* 21 U.S.C. § 841(b)(1)(A). Rivera filed no objections to the Probation Office's calculation of the guideline range,

---

[11] Rivera has "preserve[d] for possible further review his position that his substantive unreasonableness claim should not be subject to plain-error review," based on other circuits' distinct positions on this issue.

No. 09-41082

but at the sentencing hearing, his counsel argued that the PSR-recommended sentence was greater than necessary to meet the goals of sentencing, given Rivera's stable employment, family history, and the facts of the offense. The district court disagreed, finding "the seriousness of the offense to be the predominant factor in sentencing," and sentenced Rivera to 235 months' imprisonment and a five-year term of supervised release.

We find unpersuasive Rivera's argument that the sentence was unreasonable in light of the Supreme Court's opinions in *Gall v. United States*, 552 U.S. 38 (2007) (holding district courts are free to vary from the Guidelines based on factors for which the Guidelines already account), and *Kimbrough v. United States*, 552 U.S. 85 (2007) (holding sentencing courts have the discretion to impose a non-Guideline sentence based on the courts' disagreement with Congressional and Sentencing Commission policy). As Rivera did not preserve this issue for appeal, we review it for plain error. *See United States v. Rodriguez-Rodriguez*, 530 F.3d 381, 387-88 (5th Cir. 2008). Rivera asserts that this Court's jurisprudence prior to *Gall* and *Kimbrough* restricted the district court's sentencing in a manner incompatible with those cases. As such, he argues that this Court should vacate the sentence and remand to the district court for reconsideration in light of *Gall* and *Kimbrough*.

This Court has rejected the same argument on numerous occasions. *See, e.g.*, *Rodriguez-Rodriguez*, 530 F.3d at 388-89; *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 766 (5th Cir. 2008). Although this Court's post-*Booker* precedent was arguably inconsistent with *Gall* and *Kimbrough*, there is no requirement that we summarily remand a sentence merely because it was imposed prior to those decisions. "[N]othing in the record indicates that the district court in making its sentencing decision here felt in any way limited in the alternatives it desired to consider by this court's sentencing jurisprudence, or in any way disagreed with the guidelines or felt that a sentence within the

21

guideline range was too harsh, or had any inclination, for any reason, to impose a lesser sentence than it did."[12]  *Rodriguez-Rodriguez*, 530 F.3d at 388.  The district court heard the arguments and concluded that a sentence within the guidelines range satisfied the factors of § 3553(a).  Rivera  has not shown any reversible plain error.

Rivera also contends that his sentence is unreasonable because 235 months is "greater than necessary" to effectuate the purposes of 18 U.S.C. § 3553(a).  We first note that the district court is not *required* to exercise its freedom to disagree with the guidelines, and thus Rivera's argument fails that "the sentence is unreasonable because . . . the district court did not consider that it could vary from the Guidelines based upon policy disagreements with them." *See Rodriguez-Rodriguez*, 530 F.3d at 388.

Rivera also argues that the sentencing judge committed clear error because he based the sentence entirely on the type and quantity of drugs at issue, and failed to consider the other  § 3553(a) factors, such as the fact that Rivera had no criminal record, and had a consistent employment record and stable family history.  However, the sentencing record shows that the district court considered all of the § 3553(a) factors and balanced them adequately.  The facts that Rivera contends the district court ignored were in fact detailed in the PSR, which the court adopted.  The sentencing judge also stated that he had considered the various § 3553(a) factors, and there is no requirement that the sentencing court give all of those factors equal weight.  *See United States v. Hernandez*, 633 F.3d 370, 375-376 (5th Cir. 2011) ("[A]lthough courts must *consider* all the § 3553(a) factors, it is not possible, let alone required, that they give incommensurable factors . . . equal weight.  Rather, they must use their

---

[12] The court's comment that there was nothing it could do about the conviction of Rivera obviously pertained to Rivera's conviction, and not the sentence. The district court's commentary on the defendant's credibility does not equal a statement that it would have gone outside of the guidelines if it could.

No. 09-41082

judgment to weigh the relative importance of each factor in relation to each particular defendant, with some factors being more important in some cases and other factors more important in others."). We therefore find that the district court committed no clear error, and that the 235-month sentence Rivera received was reasonable.

## CONCLUSION

For the aforementioned reasons, the judgment of conviction and sentence as to Rivera is in all things AFFIRMED.